James Frank DUNAWAY, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 1999–SC–0886–MR.

Supreme Court of Kentucky.

Nov. 21, 2001.

Shelly R. Fears, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

A.B. Chandler III, Attorney General of Kentucky, Todd D. Ferguson, Assistant Attorney General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee.

JOHNSTONE, Justice.

Appellant, James Frank Dunaway, appeals his convictions from Jefferson Circuit Court of two counts of first-degree robbery and of being a first degree persistent felony offender. In this matter of right appeal, Dunaway argues that these convictions should be dismissed with prejudice because his right to a speedy trial— as articulated in KRS 500.110, Section 11 of the Kentucky Constitution, and the Sixth Amendment to the United States Constitution—was violated. We hold that Appellant's right to a speedy trial was not violated and, accordingly, we affirm the judgment of the trial court.

On June 26, 1998, Dunaway was arrested for his involvement in a series of armed robberies in Jefferson County. Russell Riggs and Terrence Tabb were also arrested in connection with the robberies. On August 27, 1998, the three men were indicted on three counts each of robbery in the first degree. In addition to the robbery charges, Dunaway was also charged with persistent felony offender in the first degree. Both co-defendants were charged with various other crimes.

At the time of his arrest, Dunaway was on parole for a prior offense. Consequently, Dunaway was returned to the Northpoint Training Center[1] to serve out his

---

1. Northpoint Training Center is a correctional facility located in Burgin, Kentucky (Mercer

term of imprisonment for the previous offense while awaiting trial on the new charges. Dunaway was arraigned on September 8, 1998.

On September 14, 1998, Dunaway filed a *pro se* motion for a speedy trial in Jefferson Circuit Court. The motion asserted that a detainer had been filed against him at Northpoint and that he had a right to be tried on the robbery charges within 180 days of his motion pursuant to KRS 500.110. Although the certificate of service indicates that a copy of the motion was served by mail, the Commonwealth denies receipt. On September 17, 1998, Dunaway's attorney filed a "Request for Final Disposition," which also relied on KRS 500.110.

On November 9, 1998, Dunaway made a motion to suppress statements due to the Commonwealth's failure to provide discovery. Dunaway also made a motion for bond reduction, which had been set at $50,000, full cash. Trial was set for November 18, 1998.

Because Dunaway, Riggs, and Tabb were all represented by attorneys employed by the Jefferson District Public Defender, a possible conflict of interest existed. Riggs and Tabb both signed waivers permitting multiple representation. Dunaway refused to sign a waiver.

On November 18, 1998, Dunaway was appointed private counsel. Due to a conflict in the trial court schedule, the case was passed to December 7, 1998, for a pretrial conference and bond hearing. At the pretrial conference, the trial date was rescheduled to March 17, 1999, and bond reduction was denied.

On January 8, 1999, Dunaway again made a motion for bond reduction. The motion was denied. Later that month Dunaway served out his term at North-

point for the prior offense, but he was not released because he could not post bond for the offenses in the present case.

On February 8, 1999, counsel for co-defendant Tabb made a motion to reschedule the trial due to a professional training seminar. The court ordered the trial rescheduled to April 14, 1999.

On March 22, 1999, Dunaway filed a "Motion to Dismiss Indictment Pursuant to KRS 500.110 and Demand for Speedy Trial." On that date, the court heard brief arguments, but ultimately passed the motion to March 24, 1999, for a full hearing. At the hearing of March 24, the trial court denied the motion.

On March 26, 1999, co-defendant Tabb entered a guilty plea. Riggs followed suit on April 14, 1999. On that date, on Dunaway's motion, the trial was reassigned to June 9, 1999. On June 9, 1999, Dunaway again made a motion to reschedule due to insufficient discovery and confusion in the trial court's schedule. The trial was reassigned to August 10, 1999.

On July 12, 1999, the Commonwealth moved to reschedule the trial so that the prosecutor could attend a seminar. The court reassigned the trial to August 17, 1999, which is the date the jury trial began. Dunaway was ultimately convicted of two counts of robbery; he plead guilty to one count of first-degree persistent felony offender.

### Statutory Right to Speedy Trial Under KRS 500.110

Dunaway first argues that his conviction was obtained in violation of KRS 500.110, which requires, generally, that a person serving a prison term within the state must be tried on any new indictment which causes a detainer to issue within 180 days

County).

after proper notice by the prisoner. Dunaway asserts both that he complied with the notice provisions of the statute [2] and that the statute applies to him because the detainer was lodged against him while he was incarcerated. The trial court found to the contrary on both points. As to the latter issue, the trial court found that KRS 500.110 was not available to Dunaway because he served out his prior sentence during the 180–day time period of the statute, which requires "continuance of the term of imprisonment." Dunaway contends that his release from his prison term, subsequent to the detainer, should not disqualify him from the protection of the statute. We agree with the trial court. Because this issue is dispositive, we address it alone.

The right to a speedy trial is an important right that receives constitutional protection. *See* United States Constitution, Amendment Six; Kentucky Constitution, § 11. The right to a speedy trial can be even more important to prisoners who have new indictments brought against them if those indictments result in a detainer being lodged. (A detainer is "a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution to either hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent." *Carchman v. Nash,* 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985)). The General Assembly, recognizing this heightened need, provided some prisoners with additional guarantees to a speedy trial when it enacted KRS 500.110:

Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of this state, and whenever during the continuance of the term of imprisonment there is pending in any jurisdiction of this state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty (180) days after he shall have caused to be delivered ... his request for a final disposition...

There is no Kentucky case law addressing Dunaway's claim that KRS 500.110 applied to him even though he finished serving his term of imprisonment after the detainer was lodged. However, there are a substantial number of cases which interpret the identical language found in the interstate equivalent of KRS 500.110. The Interstate Agreement on Detainers (IAD) (Article III, § 1), excepting an additional sentence and the interstate application, is substantively indistinguishable from KRS 500.110. *See* KRS 440.450. The Kentucky Court of Appeals noted the similarity between the two statutes in *Rushin v. Commonwealth,* Ky.App., 931 S.W.2d 456, 458 (1996).

The IAD is an agreement adopted by the overwhelming majority of states and the federal government. The IAD requires that a prisoner against whom an interstate detainer has been filed must be promptly notified of that fact and of his right to demand trial, and if he demands trial then trial must be had within 180 days; the request is a waiver of extradi-

**2.** Dunaway argues that he properly delivered his *pro se* motion for a speedy trial to both the court and the Commonwealth's Attorney as per KRS 500.110 on September 14, 1998. The Commonwealth denies receipt of the motion. The date the motion was received is critical because it begins the 180–day period

in which the trial must begin. For the reasons discussed below, the delivery issue is moot because Dunaway served out his term on January 29, 1999, significantly prior to the expiration of the 180–day period suggested by Dunaway.

tion by the prisoner; if trial is not had within 180 days and good cause for delay is not shown, the charges are dismissed with prejudice. *See* 4 Wayne R. LaFave et al., *Criminal Procedure*, § 18.4(c) at 711–13 (2d ed.1999). The IAD was adopted in Kentucky in 1974, four years prior to KRS 500.110.

Prior to the IAD, there existed an unsanctioned practice of lodging detainers based on untried criminal charges that were unsubstantiated. The detainers were often withdrawn just before the prisoner was released. Though unfounded, the detainers would have a detrimental effect on the prisoner's treatment. See *Carchman,* 473 U.S. at 729, 105 S.Ct. at 3408, 87 L.Ed.2d at 526; *see also* Leslie Abramson, *The Interstate Agreement on Detainers: Narrowing its Availability and Application,* 21 N.E.J. on Crim. & Civ. Con. 1 (1995). The purpose of the IAD is to "encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments ..." KRS 400.450, Article I. The specific problems that a prisoner, against whom a detainer has been filed, might face include being:

> (1) deprived of an opportunity to obtain a sentence to run concurrently with the sentence being served at the time the detainer is filed; (2) classified as a maximum or close custody risk; (3) ineligible for initial assignments to less than maximum security prisons (i.e., honor farms or forestry camp work); (4) ineligible for trustee [sic] status; (5) not allowed to live in preferred living quarters such as dormitories; (6) ineligible for study-release programs or work-re-

lease programs; (7) ineligible to be transferred to preferred medium or minimum custody institutions within the correctional system, which includes the removal of any possibility of transfer to an institution more appropriate for youthful offenders; (8) not entitled to preferred prison jobs which carry higher wages and entitle [him] to additional good time credits against [his] sentence; (9) inhibited by the denial of possibility of parole or any commutation of his sentence; (10) caused anxiety and thus hindered in the overall rehabilitation process since he cannot take maximum advantage of his institutional opportunities.

*Carchman,* 473 U.S. at 730, 105 S.Ct. at 3409, 87 L.Ed.2d at 527, quoting *Cooper v. Lockhart,* 489 F.2d 308, 314, n. 10 (1973) (overturned on other grounds).

In summary, KRS 500.110 was adopted after the IAD and used the same language. In addition, the reasons supporting the IAD seem to apply with equal force to the intrastate statute. Consequently, contrary to Dunaway's unsupported suggestion, we find cases interpreting the IAD insightful for our decision in this case regarding KRS 500.110.[3]

■ Courts that have considered the issue of whether the IAD applies after a prisoner is no longer imprisoned for the prior offense(s) have overwhelmingly found that the IAD does not apply. Most of the cases involved a prisoner who was released on parole; however, a case involving a prisoner who completed his sentence—like Dunaway—would receive the same analysis. Once the prisoner has been released, the need for protection from detainers—substantiated or not—

---

**3.** The IAD, though similar to KRS 500.110, is not the same. For example, the IAD explicitly requires notice by certified mail, but KRS 500.110 does not. For that reason, cases interpreting the IAD may not always be helpful in construing KRS 500.110 and this opinion does not address such collateral issues as proper methods of notice under KRS 500.110.

evaporates. *See United States v. Reed,* 620 F.2d 709, 711 (9th Cir.1980), *cert. denied,* 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104, (1980) ("neither a pretrial detainee nor a parole violator has a sufficient interest in the rehabilitation programs of his confining institution to justify invocation of the Act"); *see also Cunningham v. State of Arkansas,* 341 Ark. 99, 14 S.W.3d 869 (2000) (prisoner released on parole after detainer lodged but before expiration of 180–day period no longer protected by IAD); *State v. Dunlap,* 57 N.C.App. 175, 290 S.E.2d 744, 746 (1982), *petition for review denied,* 306 N.C. 388, 294 S.E.2d 213 (1982) (once prisoner released, "the cloud of the detainer no longer has an adverse effect on the prisoner's status within the prison"); *State v. Foster,* 107 Or.App. 481, 812 P.2d 440, 441 (1991) ("when defendant was released on parole, the relevant term of imprisonment ended").

Appellant cites *Davis* and *Snyder*—both IAD cases—in support of his argument that, since he was incarcerated when the detainer lodged, the protection of KRS 500.110 still applies. *Commonwealth of Pennsylvania v. Davis,* 2000 Pa.Super. 217, 757 A.2d 959 (2000); *Snyder v. Sumner,* 960 F.2d 1448 (9th Cir.1992). We believe *Davis* is inapposite because it does not address the present issue. The issue in that case was "whether the Uniform Criminal Extradition Act [(UCEA)] applies where a fugitive is returned after completing a sentence in another state, but where the request for custody of that defendant is made while he is serving a sentence in the other state." *Davis* at 960 (the UCEA is distinct from the IAD). The court determined that the IAD applies merely to "sentenced" prisoners and in doing so relied on two other cases that were not construing the IAD. *Davis* at 961, citing *Commonwealth v. Forrest,* 508 Pa. 382, 498 A.2d 811 (1985); *Common-*

*wealth v. Alexander,* 318 Pa.Super. 344, 464 A.2d 1376 (1983). While examining the UCEA, the *Davis* court completely ignored the case law construing the IAD.

Appellant's reliance on *Snyder* is likewise unpersuasive. In that case, the court held that when a prisoner who has a detainer lodged against him is paroled during the 180–day period of the IAD, he continues to benefit from the statute's protection. The court stated that the defendant's "being placed on parole does not stop the clock as to his IAD[ ] rights." *Snyder* at 1453. That case involved an interstate detainer and the court reached its decision based on concerns that permitting the sending state—the state where the prisoner is serving time—to parole the prisoner after it transfers the prisoner to the receiving state—the state which issues the detainer—would frustrate the purpose of the IAD.

We agree with the Supreme Court of Arkansas, which sidestepped the specious arguments in *Snyder:* "We simply do not share the *Snyder* court's concerns that the IAD's requirements can or will be so easily manipulated by the states, but more importantly, we believe that the rationale in *Snyder* ignores the plain language contained in Article III [sec. 1] of the [IAD] which by its own terms, provides the IAD only applies during the period when a prisoner continues to serve a term of imprisonment." *Cunningham,* 14 S.W.3d at 872; *see also United States v. Saffeels,* 982 F.2d 1199, 1204 (8th Cir.1992), *vacated and remanded on other grounds,* 510 U.S. 801, 114 S.Ct. 41, 126 L.Ed.2d 12 (1993) ("by its own terms, Article III only applies during the period when a prisoner continues to serve a term of imprisonment"). The statutes—both the IAD and KRS 500.110—explicitly refer to the "continuance" of the term of imprisonment. The word "continuance" forecloses Appellant's interpreta-

tion that KRS 500.110 continued to apply to him after he completed his sentence. Because Dunaway did not qualify for KRS 500.110, he cannot claim that his right to a speedy trial under that section was violated.

### Constitutional Right to Speedy Trial

■ Though Appellant does not qualify for KRS 500.110, he still has the right to a speedy trial; that right is simply protected by other provisions. Consequently, Dunaway next argues that his constitutional rights to a speedy trial were violated. If his rights were violated, dismissal would be "the only possible remedy." *Strunk v. United States,* 412 U.S. 434, 439, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56, 61 (1973). However, we conclude that Dunaway's rights to a speedy trial were not violated.

■ We analyze a defendant's constitutional rights to a speedy trial, under both the Federal and Kentucky constitutional provisions, by applying the four-factor *Barker* test. *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). That test involves an examination of: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant caused by the delay. The factors are balanced and "[n]o single one of these factors is determinative by itself." *Gabow v. Commonwealth,* Ky., 34 S.W.3d 63, 70 (2000).

### Length of Delay

■ The analysis begins by determining if the delay was presumptively prejudicial to the defendant; for if it was not, the defendant's rights were not violated, and the inquiry ends. *See id.,* 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. As the Court stated in *Barker:* "[L]ength of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors." *Id.* at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. Determining whether a delay was presumptively prejudicial requires examining two elements: the charges and the length of the delay.

Whether a delay is presumptively prejudicial depends, in part, on the charges involved. That is, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Id.* at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. In this case, Dunaway was charged with three counts of first-degree robbery and one count of persistent felony offender. We consider these charges to be serious and of moderate complexity.

■ The second element, length of the delay, is the time between the earlier of the arrest or the indictment and the time the trial begins. *Dillingham v. United States,* 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975). Dunaway was arrested on June 26, 1998, prior to his indictment. His trial began on August 17, 1999. Therefore, the delay between arrest and trial was approximately thirteen and one-half months. While courts differ in the length of delay they require to find presumptive prejudice, we believe that a thirteen and one-half month delay, under the facts of this case, is presumptively prejudicial. *Compare Graves v. United States,* 490 A.2d 1086, 1091 (D.C.App.1984) *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788, (1986) ("a delay of more than a year gives prima facie merit" to a claim of denial of speedy trial); *State v. Goss,* 245 Kan. 189, 777 P.2d 781, 785 (1989) (delay of "a little over a year" not presumptively prejudicial); *Salandre v. State,* 111 N.M. 422, 806 P.2d 562, 568 (1991) ("nine months marks the minimum amount of time that may be considered presump-

tively prejudicial"); *State v. Wilson,* 671 A.2d 958, 961 (Me.1996) (seven-month delay not sufficient to trigger inquiry); *City of Billings v. Bruce,* 290 Mont. 148, 965 P.2d 866, 877 (1998) ("we establish 200 days as the necessary length of time to trigger further speedy trial analysis").

### Reason for Delay

Having found that Dunaway's thirteen and one-half month delay was presumptively prejudicial, we now examine the remaining three *Barker* factors, beginning with the reason for delay. The Court enumerated three categories of reasons for delay: (1) a "deliberate attempt to delay the trial in order to hamper the defense"; (2) a "more neutral reason such as negligence or overcrowded courts"; and (3) "a valid reason, such as a missing witness." *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. The Court explained that different reasons should be allocated different weights (*see id.*)—even reasons within the same category. *See Graves v. U.S.,* 490 A.2d 1086 (D.C.1984). For example, delay due to negligence, which is a neutral reason, would weigh more heavily in favor of a speedy trial violation than court overcrowding, which is also classified as a neutral reason. *See Zurla v. State,* 109 N.M. 640, 789 P.2d 588 (1990) ("bureaucratic indifference should weigh more heavily against the state than simply case overload"). Further, the Court was clear that even a neutral reason weighs against the state because "the primary burden [is] on the courts and the prosecutors to assure that cases are brought to trial." *Barker,* 407 U.S. at 529, 92 S.Ct. at 2191, 33 L.Ed.2d at 115. We now turn to the record to examine the reasons for delay in Dunaway's case.[4]

Appellant's brief explains that there was a one-week delay (9/1/98—9/8/98) due to Dunaway's failure to appear at his arraignment because of his incarceration. We find this to be a valid reason. There was a seventeen-day delay (11/20/98—12/7/98) by agreement of all parties due to a conflict in the trial court schedule. We find this to be a neutral reason. There was a delay of over three months (12/7/98—3/17/99) which appears to have been due to the trial court's schedule. We find this to be a neutral reason. There was a one-month delay (3/17/99—4/14/99) due to a motion by co-defendant Tabb to reschedule trial. We find this to be a valid reason. There was a four-month delay (4/14/99—8/10/99) due to Dunaway's two requests for a new trial date. We find this to be a valid reason. Finally, there was a one-week delay (8/10/99—8/17/99) so that the prosecutor could attend a seminar. We find this to be a neutral reason.

To summarize, deducting the four months due to Appellant's delay leaves nine and one-half months. Of that time, one month's delay was due to co-defendant Tabb and four months were due to conflicts with the trial court's schedule. There is no evidence these court delays were either intentional or avoidable. Only one week of delay is attributable to the prosecution. None of the delay was due to a "deliberate attempt to delay the trial in order to hamper the defense." *Id.*

Appellant argues that the real reason for delay was that the prosecution had insufficient evidence to proceed to trial at the time Dunaway asserted his right to a speedy trial. On August 18, 1998, co-defendant Tabb made statements implicating Dunaway in the charged robberies. At a suppression hearing on March 24, 1999, Tabb recanted his August accusations. On

---

**4.** We examine the record as submitted by the parties in their briefs. We do not detail all delays that occurred in the case, but only those we find noteworthy.

March 26, 1999, Tabb entered a plea agreement by which he would receive probation in exchange for testimony against Dunaway and Riggs. Appellant claims that the prosecution only had sufficient evidence to go to trial after the plea agreement.

We are unpersuaded by Dunaway's argument. Assuming, *arguendo*, that the prosecution did not have sufficient evidence to go to trial prior to March 26—a claim the prosecution denies—the prosecution did have sufficient evidence on March 26, after the plea agreement. That date was well within Appellant's constitutional speedy trial period. Further, at no time prior to March 26 did the prosecution seek a continuance, so it could not be held directly responsible for any of the preceding delays. Lastly, an appeal on speedy trial grounds is not the most fitting time to address an insufficiency of evidence claim, which appears to be the thrust of this argument by Appellant.

■ The final point we make about the reason for delay, and perhaps the most damning for Appellant, is that four months of delay are attributable to him. Trial postponements by the defendant "toll the running of the constitutional speedy trial clock." *DeLoach v. State*, 722 So.2d 512, 517 (Miss.1998). The *Barker* Court also countenanced that a defendant's own actions might thwart his speedy trial claim: "We hardly need add that if delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine ..." Barker, 407 U.S. at 529, 92 S.Ct. at 2191, 33 L.Ed.2d at 115.

### *Defendant's Responsibility to Assert the Right*

■ The third *Barker* factor is defendant's demand for a speedy trial. While the defendant has a right to a speedy trial regardless of whether he makes a demand, assertion of the right is a factor to consider. *See Id.* at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

■ It appears from the record before us that Dunaway asserted his right to speedy trial. Because the Commonwealth does not dispute this fact, we do not discuss the propriety of defendant's separate assertions of the right. Such assertions are "entitled to strong evidentiary weight" in deciding whether the defendant's rights were violated. *Id.* This factor weighs in favor of the defendant. However, as the Sixth Circuit has noted, a defendant's assertions "must be viewed in light of [defendant's] other conduct." *United States v. O'Dell*, 247 F.3d 655, 671 (6th Cir.2001), quoting *United States v. Loud Hawk*, 474 U.S. 302, 314, 106 S.Ct. 648, 656, 88 L.Ed.2d 640, 654 (1986). In that case, the court found that six months of frivolous petitions by the defendant reduced the sincerity of defendant's assertion of his right. In the present case, Dunaway refers to delays at the trial court, but never mentions voicing a single objection. As we stated in *Gabow*: "If a defendant acquiesces in a delay, he cannot be heard to complain about the delay." *Gabow*, 34 S.W.3d at 70. Also, Appellant repeatedly asserts in his brief that he was ready for trial by March 17, 1999. But by April he requested a continuance, and in June he requested another. Appellant's two requested continuances belie his claim of being prepared and further deflate his speedy trial claim. For these reasons, we conclude that Dunaway's assertion of his right weighs in his favor, but not as heavily as it might.

### *Prejudice to the Defendant*

The *Barker* Court identified three interests bearing on the prejudice to the defendant caused by the delay: "(1) to prevent oppressive pretrial incarceration; (2) to

minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired." *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. Of these three, the last is the most serious. *See id.*

Appellant claims that all three prejudicial interests exist in his case. He first points to his eight-month pretrial incarceration, which for purposes of his speedy trial claim began after he completed his original sentence.[5] Dunaway also points to his "anxiety and concern over his predicament" as demonstrated by his repeated demands for a speedy trial. We agree that delay can cause anxiety and incarceration can prejudice the defense; however, we note that in *Barker* the Court found only minimal prejudice due to a ten-month pretrial incarceration and nearly four years of anxiety producing, post-indictment proceedings. *See Barker,* 407 U.S. at 534, 92 S.Ct. at 2194, 33 L.Ed.2d at 119. And as LaFave points out, "absent some unusual showing[, anxiety and concern] is not likely to be determinative in defendant's favor." LaFave et al., *Criminal Procedure,* § 18.2(e) at 684. Dunaway has made no showing of unusual anxiety in his case. As for the last and most important factor, Dunaway claims that he suffered impairment because if he had been tried earlier, co-defendant Tabb's testimony would not have been available and Dunaway would have been "ensured" of an acquittal. Appellant seems to rely on the 180-day period of KRS 500.110 as the magical termination date. As we discussed, *supra,* Dunaway is ineligible for the 180-day provisions of KRS 500.110 and co-defendant Tabb's plea agreement—including his promise to testify against Dun-

away—occurred within the constitutional time period.

We conclude, after balancing the *Barker* factors, that Dunaway's constitutional rights to a speedy trial were not violated. Though Dunaway asserted his rights and the length of delay was presumptively prejudicial, the reasons for the delay were acceptable and the prejudice caused the Appellant was minimal.

For the foregoing reasons, the judgment of the Jefferson Circuit Court is affirmed.

All concur.

---

5. Dunaway's incarceration prior to January 29, 1999, when he completed his term at Northpoint, does not weigh toward his present speedy trial claim. *See State v. Murchi-* *son,* 541 N.W.2d 435 (N.D.1995) (pretrial incarceration for prior offense did not apply to calculation of speedy trial period).