# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: JUNE 19, 2008
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2007-SC-000142-MR

DATE 7-10-08 Ev.A.GrawMDC

LEONDO HARRIS          APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE GEOFFREY P. MORRIS, JUDGE
NOS. 05-CR-002347 AND 05-CR-002918

COMMONWEALTH OF KENTUCKY          APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Leondo Harris appeals as a matter of right from a January 23, 2007 Judgment of the Jefferson Circuit Court convicting him of first-degree rape, first-degree robbery, and first-degree sexual abuse. In accord with the jury's recommendation, the trial court sentenced Harris as a second-degree persistent felon to fifty years in prison. Harris was found guilty of robbing, sexually abusing, and then raping T.W. in Louisville in 1996. On appeal, Harris contends that he was denied his rights to timely prosecution and a speedy trial and that his trial was rendered unfair by (1) the under-representation of African-American males on the venire from which the petit jury was chosen; (2) the exclusion of evidence that the complaining witness, T.W., was a convicted felon; (3) the use of jury instructions which understated the Commonwealth's burden of proof; and (4) the prosecutor's misuse of closing argument to suggest that Harris had to prove his

innocence. Convinced that Harris received a fundamentally fair trial with reasonable promptness, we affirm.

## RELEVANT FACTS

T.W. testified that as she was leaving a pay-phone near her home on Virginia Avenue in Louisville shortly before 9:00 p.m. on November 5, 1996, she was accosted by an African-American man wearing a black sweat-shirt with its hood pulled over his head and around his face. The man showed her a handgun and directed her to an unlighted alley between two buildings where he first robbed her of the small amount of cash in her possession, rummaged in her bra for more cash, ordered her to remove her shirt and lower her pants, and then vaginally raped her. During the assault, the man several times threatened T.W. with the gun and ordered her not to look at him. Once the man had fled, T.W. sought help at a nearby apartment, where the occupants helped her call 911. At trial, T.W., one of the persons who assisted her, and two of the police officers who responded to the 911 call all testified that in the immediate aftermath of the assault T.W. was distraught, that she was crying and sobbing uncontrollably, and that her clothes were disheveled. A short time later, T.W. was interviewed by the detective assigned to the case, but she had not recognized her assailant and was unable to provide more than a very general description. Following the interview, she was taken to the hospital where she was examined and a vaginal smear collected. The detective placed that evidence in storage. When no leads developed, the police eventually declared the case "cold" and placed it in abeyance.

In the meantime, advances in technology led to the Federal Bureau of Investigation's creation of the Combined DNA Index System ("CODIS"), "a massive centrally-managed database linking DNA profiles culled from federal, state, and

2

territorial DNA collection programs," United States v. Kincade, 379 F.3d 813, 819 (9th Cir. 2004). Pursuant to CODIS, local law enforcement agencies collect DNA samples from, among other sources, crime scenes and individuals convicted of qualifying state offenses. *See* KRS 17.170 – 17.175. The DNA is analyzed, and the resulting profiles are incorporated in the database, making possible nationwide computer searches for matches between the evidence from different crime scenes as well as between the crime scene evidence and the known-offender profiles. In 2000, Congress passed the DNA Analysis Backlog Elimination Act, Pub. L. No. 106-546, 114 Stat. 2726 (2000), which provided grant money to the states to fund lab work in hopes of eliminating some of the enormous backlog of collected but unanalyzed samples. Tracey Maclin, Is Obtaining an Arrestee's DNA a Valid Special Needs Search Under the Fourth Amendment? 33 J.L. Med. & Ethics 102 (Spring 2005). Due to one such grant, in 2005 the State Police Crime Lab in Frankfort reworked the evidence gathered in T.W.'s case and from semen present on the vaginal swabs obtained a male DNA profile that proved to be a perfect match with Harris's offender profile. T.W.'s case was reopened, and on August 4, 2005 a Jefferson County Grand Jury indicted Harris. Not long after the indictment, the Commonwealth obtained a new blood sample from Harris and confirmed the match between his DNA and that obtained from T.W.'s rape kit.

Harris's case was first called to trial on January 31, 2006, but at that time the Commonwealth admitted that it had not yet located T.W. and requested a continuance. Harris objected and moved that the case be dismissed without prejudice. The trial court apparently understood his motion as a demand for a speedy trial, but given the obvious importance of the witness, the seriousness of the charges, and the fact that the prosecution was then only about six months old, the trial court denied the motion to

3

dismiss and rescheduled trial for June 27, 2006. On June 23, 2006, the Commonwealth again requested that the trial be continued. Although it had located T.W., another key witness—the detective initially assigned to T.W.'s case in 1996—was on vacation. Again Harris objected, but again the trial court rescheduled trial, this time for August 22, 2006. When that date rolled around, Harris requested more time—to file a KRE 412 motion and to interview witnesses—and so once again trial was postponed. Harris was finally tried in October 2006, about fourteen months after his indictment and almost ten years after the alleged offense. He contends that these delays violated his constitutional rights to timely prosecution and speedy trial. We disagree.

## ANALYSIS

### I. Harris Was Not Denied His Right To Timely Proceedings.

### A. The Nine Year Delay Between Harris's Offense And His Indictment Did Not Deny Him Due Process Of Law.

Harris did not object during the trial court proceedings to the alleged delay in prosecution. His belated objection may now be addressed, therefore, only to the extent of observing that the delay did not constitute a palpable error. As the parties correctly note, the speedy trial guarantee of the Sixth Amendment to the United States Constitution does not apply to delays occurring prior to arrest, indictment, or the bringing of any formal charge. United States v. Marion, 404 U.S. 307, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971). Our General Assembly, moreover, has rejected a statute of limitations for felonies:

> A legislative determination has been made that felony charges may be brought at any time; that the interest of the Commonwealth in the prosecution of crime outweighs the benefits normally associated with statutes of limitation; and that there is no right to be free of felony prosecution by the mere passage of time.

4

<u>Reed v. Commonwealth</u>, 738 S.W.2d 818, 820 (Ky. 1987) (discussing KRS 500.050(1)).

To be sure, as Harris notes, the United States Supreme Court has indicated that unjustified and prejudicial pre-accusation delay could, in a proper case, amount to a denial of due process in violation of the Fourteenth Amendment. <u>United States v. Marion</u>, <u>supra</u>. That Court has also indicated, however,

> that in the absence of "substantial prejudice" and "intentional delay to gain tactical advantage," no due process violation would be found.

<u>Reed v. Commonwealth</u>, 738 S.W.2d at 820 (quoting from <u>Marion</u> and citing <u>United States v. Lovasco</u>, 431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977)). Although Harris argues that we should alter this settled law and hold that lengthy pre-accusation delay is presumptively prejudicial, an unpreserved allegation of error hardly provides a suitable occasion for considering such a change. Even if Harris could establish some degree of prejudice, moreover, the delay here was clearly not intentional. There being no statutory or constitutional basis for the relief Harris seeks, his prosecution for a nine-year-old felony offense did not amount to a palpable error.

**B. Harris Was Not Denied His Right To A Speedy Trial.**

Once formal proceedings had been initiated—in this case by the August 4, 2005 indictment—the Sixth Amendment to the United States Constitution and Section Eleven of the Kentucky Constitution entitled Harris to a speedy trial. That guarantee does not mean a trial within some set number of days or months, but rather a trial not unreasonably delayed. <u>Barker v. Wingo</u>, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). Under both the federal and state constitutions, we analyze whether this right has been violated by applying the four-factor test the United States Supreme Court

5

announced in <u>Barker</u>,

> That test involves an examination of (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant caused by the delay. The factors are balanced and "no single one of these factors is determinative by itself."

<u>Dunaway v. Commonwealth</u>, 60 S.W.3d 563, 569 (Ky. 2001) (citation and internal quotation marks omitted).

Here, the fourteen months that elapsed from Harris's indictment until his trial lies in the borderland between what both this Court and the United States Supreme Court have deemed presumptively reasonable and presumptively unreasonable delay. Delays much less than a year generally do not raise constitutional concern, but beyond that the other <u>Barker</u> factors take on increasing significance. <u>Doggett v. United States</u>, 505 U.S. 647, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992); <u>Soto v. Commonwealth</u>, 139 S.W.3d 827 (Ky. 2004). Where the delay is in the neighborhood of a year, like the delay in this case, it does not violate the constitutional guarantee if it is occasioned by legitimate reasons and does not unduly prejudice the defendant's ability to present a defense. <u>Barker</u>, <u>supra</u>; <u>Dunaway</u>, <u>supra</u>. Neither factor lends much weight to Harris's claim. Harris cannot complain about the two month delay he himself requested, and otherwise, the Commonwealth was entitled to a reasonable opportunity to marshal its witnesses. The eight months given it for that purpose in this case reflect only legitimate problems associated with bringing a cold case to trial—here the police had understandably lost contact with the complaining witness, who had remarried in the interim and changed her name—and with trying a case during the summer months when vacations are a fact of life. There is no suggestion that the delay was deliberate or intended to confer a tactical advantage.

6

Nor did the delay unduly prejudice Harris. Harris was imprisoned for another offense when these charges were brought, and he complains that the delay cost him an opportunity for parole. That is not a meaningless consideration, of course, but because parole is never assured; because the delay was not long; and because Harris would likely have remained incarcerated on the present charges anyway, the possible interference with parole does not weigh heavily in Harris's favor. More importantly, Harris has identified no evidence lost because of the delay or any other effect on the fairness of his trial beyond his representations that two defense witnesses, his mother and his sister, would have had a better command of the pertinent facts and details had they testified years earlier. In stark contrast to T.W.'s testimony, Harris testified that he and T.W. were in a secret dating relationship from about 1992 until after the alleged crime and that their sexual relations were consensual. His mother and his sister testified that they had seen Harris and T.W. together. Harris does not allege that the post-indictment delay—or the pre-indictment delay for that matter—prevented him from presenting other witnesses or evidence able or tending to corroborate his claims. In these circumstances, the delays granted to the Commonwealth to find T.W. and to accommodate the detective did not deprive Harris of a speedy trial.

## II. Harris Was Not Denied A Fair Trial.

### A. Harris Has Not Shown That His Jury Was Improperly Selected.

Harris next contends that in several ways he was denied a fair trial, first because his jury was not selected from a fair cross section of the community. The forty-five-person venire from which Harris's jury was selected included, according to Harris, only one African-American man. Harris called the trial court's attention to this fact, argued that the panel thus did not represent the community, and moved that a new panel be

7

called. The trial court denied Harris's motion. Harris contends that the trial court erred and notes that the Sixth and Fourteenth Amendments to the United States Constitution entitle him to an impartial jury drawn "from a fair cross section of the community." Duren v. State of Missouri, 439 U.S. 357, 359, 99 S. Ct. 664, 666, 58 L. Ed. 2d 579 (1979) (citing Taylor v. Louisiana, 419 U.S. 522, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975)). To establish a *prima facie* violation of this right, however, Harris was obliged to show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364, 668. It is not enough to allege merely that a particular jury or a particular venire failed to mirror the community and reflect the various distinctive groups in the population, for, as the Supreme Court has explained,

> [d]efendants are not entitled to a jury of any particular composition, . . . but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

Taylor v. Louisiana, 419 U.S. at 538, 95 S. Ct. at 702 (citations omitted).

Harris's motion did not meet this standard. Even assuming that African-American men constitute a distinctive group for jury selection purposes, Harris made no attempt to show that they are regularly under-represented on Jefferson County venires or that the jury selection process systematically excludes them. Absent these showings, the trial court did not err when it rejected Harris's objection to the venire. Harris's unelucidated suggestion that with Batson v. Kentucky, 476 U.S. 79, 106 S. Ct.

8

1712, 90 L. Ed. 2d 69 (1986), the Supreme Court relaxed the standard for making out a fair-cross-section challenge is unavailing. Batson dealt with the prosecution's use of juror strikes invidiously to exclude members of a distinctive group from a petit jury, it did not address or alter the law relating to the formation of venires. This is apparent from Batson itself as well as from the fact that in Batson's wake the federal courts continue to apply the Duren test to fair-cross-section challenges. *See e.g.* United States v. Lara, 181 F.3d 183 (1st Cir. 1999) (discussing the statistical evidence usually proffered to establish systemic underrepresentation).

## B. Harris Was Not Denied An Opportunity To Impeach T.W.

Harris next contends that he was improperly denied an opportunity under KRE 609 to impeach T.W. with the fact that she is a convicted felon. Prior to trial, the Commonwealth moved to exclude that fact on the grounds that the conviction post-dated the alleged rape and that T.W.'s offense—drug possession—had little or no bearing on her credibility. The trial court indicated that it was leaning toward granting the Commonwealth's motion, but rather than rule at that time, it instructed defense counsel to raise the matter again during T.W's cross-examination if he still wished pursue the impeachment. Counsel failed to raise the issue while T.W. was on the stand, and only near the close of proof did he attempt to "preserve" the issue by renewing his objection to the Commonwealth's pre-trial motion. At that point the court reminded counsel that it had reserved ruling on the motion and noted that counsel had not sought to ask the impeaching question. It then ruled that if T.W. were called as a rebuttal witness, the defense could impeach her with her prior conviction. The Commonwealth thereupon declined to call T.W. in rebuttal. Harris contends that the trial court erred by excluding the prior-conviction evidence, but as noted, the trial court

9

did no such thing. The court reserved ruling and left it up to defense counsel to pursue the matter further at the appropriate time. Counsel's failure to do so and to obtain a ruling constitutes a waiver of his objection, Hayes v Commonwealth, 175 S.W.3d 574 (Ky. 2005), and certainly counsel's failure is not attributable to the trial court as an error. Harris, therefore, is not entitled to relief on this ground.

**C. The Jury Instructions Did Not Dilute The Presumption Of Innocence.**

Harris next asserts that the jury instructions unfairly tended to dilute the presumption of innocence and to shift the burden of proof from the Commonwealth to the defense. The instruction's introductory paragraph informed the jury that it was to find the defendant "not guilty under these instructions unless you believe from the evidence beyond a reasonable doubt that he is guilty of the following offenses . . . ." It then listed the offenses with which Harris was charged. A separate instruction also informed the jury that Harris was presumed to be innocent and that the jury "sh[ould] find the defendant not guilty unless you are satisfied from the evidence beyond a reasonable doubt that he is guilty." The separate instructions on each charged offense, however, provided that "you will find the defendant, Leondo Harris, guilty of [the particular offense] under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following . . ." followed by the elements of the particular offense. Harris contends that the formulation "not guilty . . . unless" better reflects the presumption of innocence and the burden of proof than the formulation "guilty . . . if and only if," and that the use of the latter in the separate offense instructions deprived him of a fair trial. We disagree.

The two formulations are logically equivalent, and whatever may be their rhetorical difference, if any, the "guilty . . . if and only if" version adequately conveys to

10

the jury the conditions the Commonwealth's proof must satisfy to authorize a guilty verdict. This is especially so, as the Commonwealth points out, in light of the introductory and "presumption of innocence" instructions which employed the "not guilty . . . unless" formulation and thus underscored the two formulations' equivalence. "Instructions are proper," we have held, "if, when read together and considered as a whole, they submit the law in a form capable of being understood by the jury." Halvorsen v. Commonwealth, 730 S.W.2d 921, 925 (Ky. 1986) (citation omitted). The "guilty . . . if and only if" instructions here satisfy this standard.

## D. Harris's Trial Was Not Marred By Prosecutorial Misconduct.

Finally, Harris contends that his trial was rendered unfair when the prosecutor indulged in inflammatory and misleading argument. During his closing, the prosecutor told the jury about "a movement in our society called 'Take Back the Night,'" a movement, he explained, in which rape and sexual abuse victims advocate social reforms aimed at making the streets safer for women. He suggested to the jury that it had an opportunity to contribute to this movement by finding Harris guilty. Harris did not object to that argument, but contends now that it amounted to flagrant prosecutorial abuse and palpable error. We disagree.

As Harris correctly notes, we have condemned similar arguments urging the jury to "send a message" or otherwise to participate in a crusade against crime, since such arguments are not based on the record and appeal improperly to the jurors' concern with their standing in the community. Brewer v. Commonwealth, 206 S.W.3d 343 (Ky. 2006); Barnes v. Commonwealth, 91 S.W.3d 564 (Ky. 2002). Absent a timely objection, however, and the opportunity for a curative admonition, we have declined to find these errors palpable, i.e. errors which alone are likely to have altered the result or

11

otherwise to have resulted in a manifest injustice. Brewer v. Commonwealth, supra, Martin v. Commonwealth, 207 S.W.3d 1 (Ky. 2006) (discussing the palpable error standard). Here, again, we are convinced that the prosecutor's argument did not amount to a palpable error. The evidence against Harris was formidable. Not only did the DNA evidence link Harris to the victim on the night of the assault, but T.W.'s testimony that she had been raped was tellingly corroborated by the testimony of the several witnesses who had observed her distress shortly after the incident and by photographs of the crime scene where leaves had been disturbed and the contents of T.W.'s pockets left strewn upon the ground. The prosecutor's "Take Back the Night" argument, moreover, although arguably outside the record did not stray egregiously from the perfectly appropriate argument that rape is a serious crime deserving of the jury's most mature deliberation. This argument, finally, was but a tiny portion of a multi-day trial, the whole of which accorded Harris his right to due process. There is no likelihood, in other words, that the prosecutor's "Take Back the Night" argument affected the result, nor did it render Harris's trial manifestly unjust.

At another point in his argument, the prosecutor criticized Harris's defense and remarked that the DNA evidence, which so clearly linked Harris to T.W., made it necessary for him "to come up with an excuse" for the presence of his semen. Defense counsel objected to that remark as suggesting that Harris was obliged to prove his innocence, and the objection was sustained. A short time later, the prosecutor summed up his view of the evidence by asserting that "[T.W.] was raped; she was robbed; and no one has come in here and been able to prove otherwise." Defense counsel again objected, but that objection was overruled. Harris contends that both remarks tended misleadingly to suggest that he bore the burden of proving his innocence and thus

12

rendered his trial unfair by undermining the presumption of innocence. We disagree.

As both parties note, we have many times observed that

> [g]reat leeway is allowed to *both* counsel in closing argument. . . . A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position.

Slaughter v. Commonwealth, 744 S.W.2d 407, 412 (Ky. 1987). In Tamme v. Commonwealth, 973 S.W.2d 13 (Ky. 1998), moreover, we noted that a prosecutor "d[oes] not 'shift the burden of proof' by arguing during the guilt phase that the defendant failed to rebut the Commonwealth's evidence." *Id.* at 38. The prosecutor's remarks here did no more. They did not exceed the leeway granted the prosecutor to argue that Harris's defense was a tactical ploy designed to account for the damning forensic evidence and that it did not rebut the substantial evidence that a rape, rather than consensual sex, had occurred. The prosecutor's closing, in sum, does not provide Harris with grounds for relief.

## CONCLUSION

In conclusion, neither Kentucky law nor the federal constitution was offended by the nine-year delay in prosecuting this case against Harris or the fourteen-month delay in bringing the case to trial. Neither delay resulted from the Commonwealth's negligence or other fault, and neither deprived Harris of a fair trial. Nor was Harris's trial marred in any of the other ways he has alleged. He has not shown that his jury was improperly selected, he was not denied an opportunity to impeach T.W., and neither the jury instructions nor the prosecutor's closing argument diluted Harris's right to be presumed innocent until proven guilty. Accordingly, we affirm the January 23, 2007 Judgment of the Jefferson Circuit Court.

13

All sitting.  All concur.


COUNSEL FOR APPELLANT:

Daniel T. Goyette
Louisville Metro Public Defender
Advocacy Plaza
717-719 West Jefferson Street
Louisville, Kentucky  40202

Bruce P. Hackett
Deputy Appellate Defender
Office of the Louisville Metro Public Defender
Advocacy Plaza
717-719 West Jefferson Street
Louisville, Kentucky  40202


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Bryan D. Morrow
Office of the Attorney General
1024 Capital Center Drive
Frankfort, Kentucky  40601