RENDERED: OCTOBER 24, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0144-MR

LARAYNA MANNING                                                 APPELLANT

           ON APPEAL FROM CHRISTIAN CIRCUIT COURT
V.                     HONORABLE ANDREW SELF, JUDGE
                           NO. 20-CR-00635

COMMONWEALTH OF KENTUCKY                       APPELLEE

**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>AFFIRMING</u>**

Larayna Manning (Manning) was convicted of one count of complicity to murder and one count of complicity to first degree robbery. She was sentenced to life imprisonment and now appeals her convictions and sentence as a matter of right. Ky. Const. § 110. After review, we affirm.

## I.     FACTS AND PROCEDURAL BACKGROUND

In the early morning hours of October 13, 2020, Calvin Taylor's neighbor[1] Treesha Shelton was asleep in her bedroom with the window open. Shelton and Taylor both lived on North Kentucky Avenue, a dead-end street, in Hopkinsville. Shelton was startled awake by the sound of gunshots and briefly

---

[1] Shelton's home was across the street and three houses down from Taylor's home.

attempted to find her glasses. Unable to find them, she looked out her bedroom window. Shelton noticed that all the lights in Taylor's house were on, and, even without her glasses, she could see that a light-colored vehicle was parked in the road front of Taylor's home under a streetlight. After Shelton heard a second round of gunfire, she saw two individuals run from Taylor's home; she could not identify their gender or race. Shelton called the police, who responded to the scene soon after at around 3 a.m. When officers entered Taylor's home, they found him dead on his kitchen floor with duct tape over his mouth and on his arm. He had been shot three times: twice in the abdomen and once through the back of his head.

After Taylor's body was discovered, Detective Michael Luckingham was assigned as the lead detective. During his preliminary investigation, Det. Luckingham found three pieces of footage from the night of the shooting on two "city cams."[2,3] The first video depicted a silver minivan pulling out of the Cooperfield Apartment Complex located approximately one mile away from Taylor's home. A silver Saturn pulled out of the apartment complex shortly after the minivan and proceeded in the same direction. The two vehicles went south on North Elm Street and turned right onto Means Avenue in the general direction of Taylor's home. A second city cam at the intersection of West First

---

[2] City cams are surveillance cameras at various intersections throughout Hopkinsville that are maintained and operated by the city.

[3] Each of the three city cam videos were played at trial, but they were not provided in record before us and cannot be seen in the video record of the trial. This Court therefore relies on Det. Luckingham's testimony regarding what they depicted.

2

Street and North Kentucky Avenue showed the minivan and the Saturn pulling up to Taylor's house at 2:11 a.m. on the night of the shooting. The minivan parked in Taylor's driveway and the Saturn parked in the street in front of the home. The same camera later captured the Saturn leaving Taylor's home, followed shortly thereafter by the minivan.

Det. Luckingham also learned during his preliminary investigation that Manning and her son Anthony Manning (Anthony)[4] were two individuals that frequented Taylor's home. Taylor and Manning were ostensibly friends, but Taylor also trafficked crack cocaine, Manning's drug of choice. It was undisputed that Manning would buy crack cocaine from Taylor at his home and often used his home as a safe place to smoke it. Det. Luckingham had Manning come to the police station for questioning on the morning of the shooting. During that interview she claimed that the last time she saw Taylor was sometime around 1 a.m. but said nothing about going back to his home a second time that night. She also admitted she had purchased and smoked crack cocaine at Taylor's home during that visit. However, she ended the interview before he could glean any additional information from her.

A few hours later, Det. Luckingham went to Manning's home to try to speak with her again and noticed a silver minivan that appeared to be the same vehicle captured on the city cam footage. Manning and Anthony lived with Manning's father, Watkins Manning (Watkins), who owned the minivan but

---

[4] As Larayna and her son Anthony Manning are mentioned extensively throughout this opinion, we refer to Anthony by his first name.

3

often allowed Anthony to use it. Det. Luckingham obtained Watkins' consent to search the minivan and nineteen grams of crack cocaine were found in the minivan's overhead sunglass compartment. The officers searched Manning's home later that day pursuant to a search warrant and found an additional five grams of crack cocaine in a jewelry box in her bedroom.

An officer with the narcotics division of the Hopkinsville Police Department, who was also a task force officer for the DEA[5], testified at trial that street drugs were more expensive during the COVID pandemic, and that the value of crack cocaine in particular ranged from around $100-$125 per gram. Anthony told the police during an interview that he was certain the crack cocaine found in the minivan came from Taylor's home and that there was "no way" Manning could have afforded to purchase it.

Sometime after the search of the minivan and home, Manning and Anthony came to the police station to be interviewed a second time. The officers again got nowhere with Manning, but Anthony provided an extensive statement about what occurred the night Taylor was murdered.[6] Anthony told them that he drove Manning to Taylor's home in the minivan sometime earlier in the evening. They then left and went to Lisa Robinson's apartment in the Cooperfield Apartment Complex. He and Manning went into Robinson's apartment, but they did not stay long. Robinson testified at trial that, although

---

[5] Drug Enforcement Administration.

[6] We acknowledge that Anthony's trial testimony deviated in several significant ways from his original statements to police and his subsequent *Alford* plea narrative. The deviations in his trial testimony are discussed in Section II(C) below.

she had known Manning for nearly ten years, Manning's presence in her home that night was odd: Robinson was no longer friends with Manning because Manning had slept with Robinson's boyfriend.

Anthony further told law enforcement that when he and Manning walked out of Robinson's apartment, the silver Saturn was already in the apartment complex's parking lot. Manning went over to the Saturn and spoke with its occupants, a black male in the driver's seat and a white male in the passenger seat, while Anthony went to the minivan. After Manning spoke to the Saturn's occupants, she got in the minivan. The minivan and the Saturn attempted to pull out at the same time, causing Anthony to stop. When he stopped, Manning got out of the minivan and went over to the Saturn and spoke to the occupants again. When she got back in the minivan, she told Anthony to take her back to Taylor's house. Anthony said he did not realize that the Saturn followed them to Taylor's house until they got there.

Anthony then told the officers that when the two vehicles got to Taylor's house, Anthony remained in the minivan while Manning and the two unidentified men in the Saturn went to Taylor's front door. Manning knocked, and Taylor let the trio in willingly. Approximately ten minutes later, Anthony heard the first round of gunshots followed soon after by a second round of gunshots.[7] After the second round, Anthony saw the two men run from Taylor's home, get into the Saturn, and leave. Manning did not come out, so

---

[7] A total of nine 9mm shell casings were recovered from Taylor's home.

Anthony went in to find her. Anthony found Manning in the bathroom between the living room and the kitchen with the bathroom door open. They then left without calling for emergency services. When Manning left Taylor's home, she had her purse and a pink Nike backpack with her.

At some point after Anthony's interview, Det. Luckingham interviewed Manning a third time. During that interview she told them that she did not remember going to Taylor's house the first time. And, while she somewhat remembered going to the Cooperfield Apartments, she did not remember anything after that. Joyce Dean, who had been at Robinson's apartment at the same time as Manning and Anthony, testified that Manning did not appear to be intoxicated that night.

Manning was arrested eight days after Taylor's murder on October 21, 2020. On October 29, the police obtained a search warrant to search her home a second time. The basis for the warrant were recorded jail phone calls between Manning and Watkins in which she instructed him to hide her pink Nike backpack.[8] When the officers executed the warrant, they found a purple Crown Royal bag inside the backpack which contained, *inter alia*, several men's watches. Estella Washington, one of Taylor's "very best friends" who cleaned his home and was familiar with his belongings testified that one of the watches found in the Crown Royal bag belonged to Taylor. She conceded on cross-

---

[8] These recorded phone calls were not played at trial and are not in the record.

examination that she could not say with certainty that it was Taylor's watch, but it appeared to be one he had owned.

In addition, several pieces of evidence taken from Taylor's home were tested for DNA. Tyiesha Moore, a forensic biologist with the ATF,[9] conducted that testing. In relevant part, Moore took several swabs from the piece of duct tape found over Taylor's mouth, the piece of duct tape found on Taylor's arm, a piece of duct tape found on the bathroom's doorframe, and an empty duct tape roll. Moore's testing concluded that Manning's DNA was not on the piece of duct tape found over Taylor's mouth. However, her DNA was on the inner ring of the empty duct tape roll; two different areas of the piece of duct tape found on Taylor's arm; and two different areas of the duct tape found on the bathroom's doorframe, one of which was a possible bitemark. For each of these findings, Moore concluded that "[t]he probability of an unrelated individual in the population, who has not contributed DNA to this sample, yielding this level of support, is less than 1 in one trillion." Notwithstanding, Moore acknowledged that two incidents happened during her testing. She explained:

> In this case there were two contamination events. One was the use of razor blades to cut the samples, those swabs that I mentioned earlier that I collected. So, for the range of time in which this case was conducted, razor blades that were unsterile were used. Since 2006 our lab has been using one time use razor blades to cut samples without any contamination issues. However, in 2021, an unknown [DNA] profile came up during our routine quality checks. And so at that point all cases that were conducted during that time frame in which these razor blades were used were evaluated to

---

[9] Bureau of Alcohol, Tobacco, Firearms and Explosives.

7

determine if the razor blade profile had contaminated the case profile. And for this case in particular it was found that the razor blade contamination did not impact the results of this case.

The second event was a sample switch that occurred when I was processing nine samples of this case. How I detected that was that a profile appeared in my reagent blank.[10] In troubleshooting this I realized that a sample switch occurred. So, because of this none of those samples were used because the control was invalid and therefore all of the results were unreliable. I then went back to the original exhibits and resampled for those nine samples that were affected. The controls for those associated samples generated results that were expected and ensure the reliability of the results that I share with you today.

In other words, Moore determined that the contaminated batch of razor blades had not affected the testing in this case, and she retested the items affected by the contaminated reagent blank with a new, non-contaminated reagent blank.

Manning's defense counsel did not deny that she was in Taylor's home at the time of his death. During opening statements, the defense seemed to indicate that it would pursue a "wrong place wrong time" defense by asserting that the only thing Manning was guilty of was being at Taylor's house at the time of his murder. During both opening statements and closing arguments, the defense mainly focused on creating reasonable doubt by alleging that law enforcement had zeroed in on Manning without bothering to find the two unidentified men that were responsible for Taylor's death and took shortcuts

---

[10] "Reagent blanks are routinely processed with samples. Laboratories include reagent blanks in the extraction, quantitation, and amplification processes to aid in monitoring potential contamination of reagents and/or supplies." *STR Data Analysis and Interpretation for Forensic Analysts*, *Negative Control(s) & Reagent Blanks*, https://nij.ojp.gov/nij-hosted-online-training-courses/str-data-analysis-and-interpretation-forensic-analysts/data-interpretation-allele-calls/step-1-internal-size-standards-and-allelic-ladders/negative-controls-reagent-blanks (last accessed Sept. 9, 2024).

during their investigation. In support of its contention, the defense highlighted that the police never located the Saturn; never identified or located the two unidentified men present at the time of the murder; never located Taylor's handgun, which he was known to always keep on the coffee table in the living room; and never located Taylor's cellphone even though it had "pinged" somewhere within Hopkinsville.[11] The defense's sole witness, Samantha Spencer, focused solely on attacking the DNA evidence.

Spencer, a forensic consultant specializing in forensic biology and crime scene reconstruction, concluded that Moore's results were unreliable. Spencer did not perform any DNA testing herself, but she reviewed the ATF's case file, ATF's SOPs,[12] and Moore's report. Spencer found issues with the same two contamination events to which Moore testified, as well as two additional issues with the positive controls used during testing and the chain of custody for four of the items. Spencer acknowledged that Moore followed ATF protocols in concluding that contamination from the razor blades was not present. Her only issue regarding the razor blade contamination event was that she was not provided with, nor did she request, the contaminating DNA profile itself so that she could conduct her own comparison. Next, Spencer asserted that both the reagent blank and four out of the five positive controls used in Moore's testing contained more than one DNA profile. She testified that, ideally, those items

---

[11] Det. Luckingham testified that the cellphone ping showed that Taylor's cellphone was "within 2500 meters [about 1.6 miles] of 809 Bluebird Court" in Hopkinsville.

[12] Standard operating procedures.

9

should contain only one easily identifiable DNA profile. During rebuttal, Moore explained that both the reagent blank and the positive controls did have a single source DNA profile. She elaborated that "based on ATF policy we leave in what is known as stutter, those artifacts or biproducts of amplification in the sample. So those additional peaks are attributed to stutter. It's not another individual present."

Finally, Spencer concluded that there was a break in the chain of custody for four items: the duct tape from Taylor's mouth, the duct tape from his arm, the duct tape found on the bathroom's doorframe, and the empty duct tape roll. She explained that a note within the case file stated that when Moore resampled those items after discovering the reagent blank contamination, the four items in question were left out on a bench in the lab covered with bench paper. Spencer contended that this constituted a break in the chain of custody. Moore testified on rebuttal that, according to ATF's policies, the chain of custody was not broken as the items remained in her custody in a secured lab throughout the testing and retesting process.

Based on the foregoing evidence, Manning was convicted of one count complicity to wanton murder and one count of complicity to first degree robbery. She was sentenced to life imprisonment for complicity to murder and twenty years for complicity to first degree robbery. She now appeals.

Additional facts are discussed below as necessary.

10

## II.  ANALYSIS

### A. Right to a Speedy Trial

Manning first argues that she was denied her constitutional right to a speedy trial.  As noted, Taylor's murder occurred on October 13, 2020, and Manning was arrested on October 21, 2020.  She was indicted nearly two months later on December 18, 2020.  For context, we note that Anthony was a co-defendant in this case until sometime between August 24, 2021, and September 22, 2021, at which time he entered an *Alford*[13] plea.  We further note that Manning remained in custody until her trial.

During the first two pretrial hearings in this case, on January 27, 2021, and March 31, 2021, respectively, the trial court simply set later hearing dates to allow both Manning's and Anthony's attorneys to review discovery in the case, which Manning's attorney had received on January 26, 2021.  During the third pretrial hearing on May 19, 2021, Manning's defense attorney stated that he and Anthony's attorney were considering setting the case for felony mediation, and the Commonwealth indicated it would be amenable to doing so.  However, when Anthony's attorney sent a follow up email to the Commonwealth on July 16, 2021, regarding mediation the Commonwealth responded, "I have no interest in mediating this case.  Unless your client is interested in providing the names and testimony about others that were involved, we just need to probably set this case for trial."

---

[13] *See North Carolina v. Alford,* 400 U.S. 25 (1970).

11

On the morning of the next status conference on July 21, 2021, nine months after Manning's arrest, she filed a motion for a speedy trial "pursuant to the Sixth Amendment of the Constitution of the United Stated, Section 11 of the Constitution of the Commonwealth of Kentucky, KRS[14] 500.110, and RCr[15] 9.02[.]" During the July 21 hearing, her attorney invoked KRS 500.110 specifically and requested that a trial date be set within 180 days. The video record is then cut off but, based on later hearings, this Court discerns that a trial date was set for October 4, 2021.

Two days after the July 21 hearing, the Commonwealth filed a "notice of intent to proceed as capital case with aggravating circumstances and notice of intent to seek the death penalty." The notice stated that aggravating circumstances[16] existed in the case that authorized the Commonwealth to seek the death penalty, life without the possibility of parole, and/or life without the possibility of parole for twenty-five years. Four days later, Manning's attorney filed a motion to dismiss the indictment for prosecutorial vindictiveness or, in the alternative, to quash the Commonwealth's notice of intent to proceed as a capital case with aggravating circumstances as not timely filed.

After a brief status conference on August 4, 2021, the trial court scheduled a full evidentiary hearing for August 24, 2021, to address the

---

[14] Kentucky Revised Statute.

[15] Kentucky Rule of Criminal Procedure.

[16] The aggravating circumstances provided in the notice were that the murder was committed during the commission of a first-degree robbery, and that the murder was committed for the purpose of receiving money or some other item of monetary value. KRS 532.025(2)(a)2.; KRS 532.025(2)(a)4.

12

competing motions. After the August 4 hearing, but prior to the August 24 hearing, the Commonwealth sent an email to Manning's and Anthony's attorneys informing them that it no longer intended to seek the death penalty, but it would still seek enhanced penalties. The email also informed them, for the first time, that the DNA testing would not be complete in time for the October 4 trial date.

During the August 24 hearing, Manning's counsel explained that he received the discovery in the case on January 26, 2021, and since that date no additional discovery had been provided and no procedural activity had occurred. Counsel therefore filed a motion for speedy trial after which the Commonwealth gave notice, for the first time, that it intended to seek the death penalty or enhanced penalties. Manning's counsel asserted that, by filing that motion, the Commonwealth was attempting to punish Manning for invoking her right to a speedy trial. Defense counsel also noted that, after the speedy trial motion was filed, the Commonwealth had provided additional discovery, some of which was dated from January, March, and April 2021. Based on this, as well as the July 16 email in which the Commonwealth abruptly changed course regarding mediation, Manning's counsel argued that the Commonwealth was attempting to stall the case as long as possible to coerce Manning and Anthony into identifying the two unknown men that were present at the time of Taylor's murder. The Commonwealth responded that it provided the supplemental discovery as soon as it had received it and clarified that it did not

13

intend to seek the death penalty but requested leave from the court to seek enhanced penalties.

While ruling on the motions the trial court noted, and the Commonwealth conceded, that the Commonwealth agreed to the October 4, 2021, trial date during the July 21 hearing without making any mention of the fact that the DNA evidence would be delayed or that it intended to seek enhanced penalties. The defense asserted that it would be unable to proceed with trial on October 4 if the court allowed the Commonwealth to seek enhanced penalties, as enhanced penalties require a great deal of additional preparation for the sentencing phase.

The trial court made an oral ruling to deny the defense's motion to dismiss the indictment and to grant the defense's motion to quash. The court reasoned that the defendants had invoked their right to a speedy trial, and that when the October 4 trial date was set the Commonwealth had provided no notice that it intended to seek enhanced penalties. The court agreed with the defense's contention that a case involving enhanced penalties could not be ready by October 4, but it made no findings as to whether the Commonwealth was being vindictive in seeking enhanced penalties or whether the Commonwealth was intentionally attempting to stall the case to force Manning and Anthony into cooperating with the investigation into the two unknown males. Rather, the "sole finding" that the court made was "that the notice of intent was not timely filed, and because the notice of intent was not timely filed, for the court to allow the Commonwealth to proceed in that fashion

14

would. . . effectively deprive the defendants of their constitutional right to a fast and speedy trial." The court intended to proceed with trial on October 4, but acknowledged a delay in receiving DNA testing results could affect that intention. The court left open the possibility that the Commonwealth could seek enhanced penalties if the October 4 date had to be continued.

By the next status conference on September 22, 2021, Anthony had entered an *Alford* plea and was no longer a co-defendant in the case. Also, during that hearing, Manning's counsel informed the court that he had COVID and would not be released from quarantine until October 1, 2021, three days before the trial was set to begin. Nevertheless, counsel stated he did not want a continuance and wanted to proceed with trial on October 4. The Commonwealth stated that, in the event the trial was continued due to the defense's illness, it would not seek enhanced penalties. The trial court continued the trial *sua sponte* as it believed that it subjected "both [defense counsel] and Ms. Manning to challenging circumstances if we were to go to trial on October 4." The trial was rescheduled for December 7, 2021.

On December 6, 2021, the day before trial was supposed to commence, the Commonwealth filed a motion to continue. During a hearing, the Commonwealth explained that the ATF lab called him that morning and informed him they found testable, female DNA on the duct tape used to bind Taylor. The ATF further informed him a final report on the DNA testing could be tentatively expected by February 2022. The defense objected to a continuance, but the trial court granted the Commonwealth's motion. The

15

court explained that it would be irresponsible to proceed with trial in the absence of what could be significant DNA evidence. The defense informed the court that if the Commonwealth's DNA results came back as a match for Manning, he would want to hire his own expert to review those results. Without waiving his objection to continuing the trial, he suggested waiting to see what the DNA results were before setting another trial that would inevitably have to be continued. The court accordingly set a hearing date for February 2, 2022, to discuss the DNA results.

We note that during the December 6 hearing the trial court found, for the first time, that KRS 500.110 did not grant Manning a statutory right to a speedy trial, as she was not a state inmate against which a detainer had been lodged. It did not acknowledge or discuss her constitutional right to a speedy trial.

During the February 2, 2022, hearing the Commonwealth's Attorney informed the court that the ATF lab was behind schedule due to COVID issues and was now expecting preliminary results by the end of the month. Defense counsel again objected to a continuance based on Manning's assertion of her right to a speedy trial. The Commonwealth responded that "speedy trial has no application in her matter, she's not a state inmate," and the trial court agreed stating, "I agree with the Commonwealth. I don't believe the speedy trial request has any bearing in this particular situation." Again, the court did not acknowledge her constitutional right to a speedy trial. The trial court then set

a pretrial conference for April 6, 2022, and a tentative trial date for August 8, 2022.

During the April 6 hearing, the Commonwealth stated that the ATF lab's preliminary DNA results were in, but it still did not have a final report. The Commonwealth represented that a final report should be completed by the end of April, and the trial court set a pretrial conference for May 4, 2022. During the May 4 hearing, the Commonwealth announced that the ATF lab had recently identified all the hairs found as belonging to Taylor except for two which it now wanted to test. The testing of those hairs would be included in the ATF's final report, but the final report would now be delayed for several months. The trial court did not continue the case but directed the Commonwealth to have the ATF lab complete its DNA analysis of everything but the hairs and provide those results to defense counsel for review. This did not occur.

At the next pretrial hearing on July 6, 2022, the parties informed the court that the ATF lab had completed its DNA testing but had not yet issued a final report. To remedy this, defense counsel prepared a draft order containing an extensive list of items. He explained that, even in the absence of a final report, his expert could be ready for trial by August 8 if she was provided with the list of items in the order. The Commonwealth having no objection, the trial court signed and entered the order and directed the ATF lab to provide the list of requested items no later than July 15, 2022. Neither the defense nor its expert was provided with those items by July 15. Defense counsel

17

consequently filed a motion to suppress all forensic evidence tested for DNA on July 19, 2022.

During a hearing on July 25, 2022, the defense noted it received the ATF lab's final report well after office hours on July 22, a Friday. He further noted that, because the Commonwealth's expert did not provide the items requested in the order entered on July 6, his expert did not have enough time to adequately review the evidence prior to the August 8 trial date. The court was at a loss as to why it had taken the ATF so long to prepare a report, but nevertheless acknowledged that it had no authority over a federal agency's lab. The court agreed it would be patently unfair to force the defense to proceed with trial in two weeks but denied its motion to suppress the DNA evidence. The trial court said its goal was to find the truth and the DNA evidence in this case was crucial to serving that purpose. Therefore, its only option was to continue the trial. Defense counsel agreed that if the trial court would not suppress the evidence, a continuance was their only option. The trial court accordingly set the fifth and final trial date for January 9, 2023. Despite the Commonwealth's attempt to continue the case yet again on the morning of January 9, the trial finally proceeded on that date.

Before reaching the merits of Manning's argument, we must address one small point of clarification regarding the comments made by the Commonwealth and the trial court concerning KRS 500.110. "That statute applies only when a defendant is incarcerated for one offense and a detainer has been lodged against him to answer for another offense[]" and does not

18

apply when "a defendant is seeking a speedy trial of an offense for which he [or she] is being held in pre-trial incarceration." *Gabow v. Commonwealth*, 34 S.W.3d 63, 69 (Ky. 2000). Accordingly, we agree with the trial court's conclusion that KRS 500.110 did not apply in this case. However, the trial court's comments seemed to indicate that because KRS 500.110 did not apply, the right to a speedy trial did not apply. To the extent this was the trial court's belief, it is incorrect. Manning's motion for a speedy trial also asserted that right under the United States Constitution,[17] the Constitution of Kentucky,[18] and RCr 9.02,[19] all of which apply even in the absence of the statutory right embodied in KRS 500.110. With that said, we now address the merits.

This Court analyzes a defendant's constitutional right to a speedy trial, under both the Constitution of Kentucky and the United States Constitution, by applying the four-factor test established by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530-33 (1972). That precedent directs us to balance: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's responsibility to assert her right; and (4) the prejudice to the defendant caused by the delay. *Id.* None of the foregoing factors are "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. . . these factors have no talismanic qualities; courts must still

---

[17] U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]").

[18] Ky. Const. § 11 ("In all criminal prosecutions the accused. . .shall have a speedy public trial[.]").

[19] RCr 9.02 ("The trials of all persons in custody under arrest shall be held as promptly as reasonably possible.").

19

engage in a difficult and sensitive balancing process." *Id.* at 533. If, upon balancing these factors, this Court determines that a defendant's right to a speedy trial is violated, "dismissal of the indictment. . . is the only possible remedy." *Id.* at 522, *accord Dunaway v. Commonwealth*, 60 S.W.3d 563, 569 (Ky. 2001).

### 1) *Length of Delay*

A speedy trial analysis "begins by determining if the delay was presumptively prejudicial to the defendant; for if it was not, the defendant's rights were not violated, and the inquiry ends." *See, e.g.*, *Dunaway*, 60 S.W.3d at 569 (citing *Gabow*, 34 S.W.3d at 70). Whether a delay was presumptively prejudicial "requires examining two elements: the charges and the length of the delay." *Dunaway*, 60 S.W.3d at 569. As the *Barker* Court explained, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." 407 U.S. at 531. Manning was charged with complicity to murder and complicity to first degree robbery; these charges are serious and of at least moderate complexity.

The second element, the length of delay, "is the time between the earlier of the arrest or the indictment and the time the trial begins." *See, e.g.*, *Dunaway*, 60 S.W.3d at 569 (citing *Dillingham v. United States*, 423 U.S. 64 (1975)). Here, Manning was arrested on October 21, 2020, prior to her indictment, and her trial began on January 9, 2023. This was a delay of two years, two months, and twenty days. Based on precedent, this Court has no difficulty in concluding that this delay was presumptively prejudicial. *See, e.g.*,

20

*Bratcher v. Commonwealth*, 151 S.W.3d 332, 344 (Ky. 2004) (holding an eighteen-month delay in a murder case was presumptively prejudicial); *Dunaway*, 60 S.W.3d at 569 (holding a thirteen and one-half month delay in a first degree robbery case was presumptively prejudicial); *Gabow*, 34 S.W.3d at 70 (holding that a thirty-four-month delay in a murder case was presumptively prejudicial).

### 2) *Reason for Delay*

Having concluded that the delay in Manning's case was presumptively prejudicial, we now address the reasons for the delay. The *Barker* Court enumerated three categories of reasons for delay:

> A deliberate attempt in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

407 U.S. at 530.

For the sake of simplicity, we have broken down the delays that occurred here into four time periods. The first period of delay—between Manning's arrest on October 21, 2020, and when she filed her motion for a speedy trial on July 21, 2021—can be attributed to the trial court giving defense counsel time to review discovery and to the trial court giving the parties time to discuss submitting the case to felony mediation. This Court holds these are valid reasons and that the initial delay of nearly nine months was accordingly justified. We acknowledge that Manning's counsel asserted, and presented

21

some evidence to support, that the Commonwealth was intentionally stalling the case during this period to pressure Manning into identifying the other two men present at the time of Taylor's death. If this were true, this period of delay would certainly be held against the Commonwealth. But, although the trial court was presented with evidence that the Commonwealth was stalling, it did not make that finding. It would accordingly be inappropriate for this Court to undertake the finding of fact required to reach that conclusion. Moreover, Manning has not pursued that argument on appeal.

The second period of delay—between July 21, 2021, when Manning filed her motion for a speedy trial and September 22, 2021, the first hearing following the trial court's ruling to quash the Commonwealth's motion to seek enhanced penalties—can be attributed to the Commonwealth intentionally filing an untimely motion. During the July 21, 2021, hearing the Commonwealth was on notice that Manning had invoked her right to a speedy trial, as counsel had filed the motion that morning. Also, during that hearing, the Commonwealth agreed to proceeding with trial on October 4, 2021. And yet, two days after that hearing the Commonwealth filed notice, for the first time, that it intended to seek the death penalty and enhanced penalties. The trial court found that this notice was untimely filed, as it did not provide the defense sufficient time to prepare for trial. We consequently hold that the second period of delay, a total of two months and one day, was invalid and should be weighed heavily against the Commonwealth.

The third period of delay—between September 22, 2021, and December 6, 2021—can be attributed to the trial court *sua sponte* continuing the October 4 trial due to defense counsel having COVID. The September 22 hearing was the first following the trial court's ruling to quash the Commonwealth's untimely notice to seek enhanced penalties. During that hearing, defense counsel informed the court that he had COVID and would not be released from quarantine until three days before the October 4 trial was to begin. Although defense counsel objected to a continuance, the trial court ruled that failing to continue the trial would be unfair to both counsel and Manning. We agree and accordingly conclude that the third period of delay—two months, two weeks, and 1 day—was for a valid reason.

The fourth and final period of delay—from December 6, 2021, to January 1, 2023—was also for a valid reason. The entirety of this period can be attributed only to delays in the ATF's lab completing its DNA testing and submitting its final report. To be sure, the length of this delay—one year, three weeks, and five days—is entirely unsatisfactory to this Court. And nothing in the record explains why this evidence was sent to a federal agency's lab rather than a Kentucky State Police forensic lab. Nevertheless, the importance of DNA evidence in modern criminal prosecutions cannot be overstated; the absence of available DNA evidence is the equivalent to having a missing witness. We accordingly cannot fault the trial court for ensuring this evidence was available, despite the incredible length of delay it caused, and hold that the delay associated with this period was valid.

23

On balance, we conclude that the bulk of the delays in this case were attributable to valid reasons while a period of only two months and one day were attributable directly to the Commonwealth. This factor must therefore be weighed in favor of the Commonwealth.

### 3) *The Defendant's Assertion of the Right to a Speedy Trial*

The third *Barker* factor to be considered is the defendant's assertion to his or her right to a speedy trial. 407 U.S. at 531. "While the defendant has a right to a speedy trial regardless of whether he [or she] makes the demand, assertion of the right is a factor to consider." *Dunaway*, 60 S.W.3d at 571 (citing *Barker*, 407 U.S. at 531). And, a defendant's "assertion of his [or her] speedy trial right. . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Id.* at 531-32. As discussed above, Manning filed a motion for a speedy trial on July 21, 2021, and thereafter, her counsel continually and staunchly asserted that right. We therefore hold this factor weighs strongly in Manning's favor.

### 4) *Prejudice to the Defendant Caused by the Delay*

The final *Barker* factor to be considered is prejudice to the defendant. *Id.* at 532. The *Barker* Court identified three "interests of defendant's which the speedy trial right was designed to protect. . . (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* Of these, the *Barker* Court held that "the most serious is the last, because the inability of a defendant adequate to prepare his case skew the fairness of the entire system."

24

*Id.* We further note that, "[w]hile a long delay creates 'presumptive prejudice' sufficient to compel a full *Barker* inquiry, it does not necessarily prove that the defendant suffered actual prejudice." *Goncalves v. Commonwealth*, 404 S.W.3d 180, 202 (Ky. 2013) (citing *Bratcher v. Commonwealth*, 151 S.W.3d, 345 (Ky. 2004)).

The only prejudice Manning asserts before this Court is that during her two-year period of pretrial incarceration, her mother was left to take care of her quadriplegic brother and two grandchildren. Manning asserts that knowing that her mother was left to shoulder that burden alone caused her to suffer an "unusual anxiety which extends beyond that which is inevitable in a criminal case." *Stacy v. Commonwealth*, 396 S.W.3d 787, 799 (Ky. 2013) (quoting *Smith v. Commonwealth*, 361 S.W.3d 908, 918 (Ky. 2012)). We cannot dispute that these circumstances, if true, likely did cause her a great deal of anxiety. However, Manning has not provided a "affirmative showing" of these circumstances, *Smith*, 361 S.W.3d at 918, nor has she asserted that her ability to present a defense was somehow hindered by the lengthy pretrial delay in this case. We accordingly cannot weigh this factor in her favor.

On balance, while the length of delay in this case was extensive, the majority of the delay can be attributed to valid reasons. And, while Manning consistently asserted her right to a speedy trial, we hold her assertion of prejudice was insufficient. We accordingly hold that her constitutional right to a speedy trial was not violated.

**B. Prior Home Invasion Evidence**

Manning's next assertions of error concern evidence of a prior home invasion, robbery, and assault with a deadly weapon that Manning and Anthony were charged with six years before Taylor was murdered. On November 29, 2021, the Commonwealth electronically filed (eFiled) a notice of intent to present KRE 404(b) evidence. The notice stated:

> [T]he Commonwealth intends to provide evidence that the Defendant, on October 16, 2014, engaged in a home invasion, robbery and assault with a deadly weapon, along with other co-defendants, including her son, Anthony Manning. This evidence is to show that the conduct she engaged in during the case at bar, shows preparation, plan, knowledge, and the absence of mistake or accident.
>
> The evidence will be in the form of certified copies of her conviction in Trigg Circuit Court Indictment No. 15-CR-00016, and possibly through the testimony of Anthony Manning. This evidence should be no surprise to the Defendant since this is a prior conviction, for very similar conduct. Counsel for the Commonwealth also called the Defendant's Attorney to discuss the filing of this Notice this same date, prior to the filing of the Notice.
>
> WHEREFORE, the Commonwealth gives notice as required by KRE 404(c).

Manning's defense counsel did not file a motion *in limine* in response to the Commonwealth's KRE 404(c) notice, and no pretrial hearing was held to address the evidence's admissibility. At trial, the Commonwealth mentioned this evidence for the first time during opening statement. As it was recounting what occurred after Taylor's murder, it said:

> So [Anthony] goes in the house. He sees Manning sitting in the bathroom floor and she says, "Is he dead?" And he says, "C'mon we've got to get out of here." Why? Because Anthony Manning and his mother have done something like this similar before. In Trigg County, a home invasion that they've been convicted of.

26

Defense counsel objected to this statement, stating, "I'm not sure where [the Commonwealth] is going with this, but there has been no 404 notice filed in regards to any sort of prior bad act in Trigg County or anywhere else in this case." The Commonwealth responded that it filed notice on November 29, 2021, and showed the trial court a copy of the notice it had previously eFiled. After reviewing the Commonwealth's copy, the trial court handed it to defense counsel. The court then looked through its own record of the filings and appeared to locate the Commonwealth's notice in the record. Upon locating it, the trial court told defense counsel, "It was filed on November 29, 2021," and overruled its objection. Defense counsel did not pursue the issue further or raise an objection regarding the admissibility of the prior bad act evidence. The Commonwealth resumed opening statement and said, "So like I said, this isn't the first time they've done this" and moved on to a different subject.

The only other time the prior home invasion was discussed was during Anthony's direct examination by the Commonwealth. During that questioning, the following exchange occurred:

**CW:**[20] Did you ever have a reason to think you shouldn't hang out with your mom?

**AM:**[21] Due to her drug use.

**CW:** When you got in trouble over in Trigg County, was that whole thing your idea or your mom's idea?

**AM:** Idea for what?

---

[20] Commonwealth.

[21] Anthony Manning.

27

**CW:** The home invasion robbery that happened in Trigg County.

**AM:** Nobody home invaded.

**CW:** When you did the robbery in Trigg County.

**AM:** I didn't commit a robbery in Trigg County.

**CW:** You and your mom didn't?

**AM:** No sir.

**CW:** You never got charged with it?

**AM:** I got charged with it.

**CW:** Okay, you pled to a lesser offense?

**AM:** Yes sir.

**CW:** Whose idea was it to commit that crime?

**AM:** It was never intended for a crime to be committed.

**CW:** It just kind of happened.

**AM:** It was alleged.

**CW:** It was alleged. But you entered a guilty plea to that?

**AM:** Yes sir.

Defense counsel did not object to this line of questioning.

Manning raises three arguments in relation to the foregoing: (1) that the Commonwealth failed to provide sufficient notice under KRE[22] 404(c) that it intended to introduce prior bad acts evidence; (2) that evidence of the prior home invasion was inadmissible under KRE 404(b); and (3) the

---

[22] Kentucky Rule of Evidence.

28

Commonwealth's questioning of Anthony regarding the incident constituted improper impeachment. As Manning's counsel only objected to a lack of KRE 404(c) notice and did not challenge the Commonwealth's questioning of Anthony concerning the prior home invasion pursuant to KRE 404(b) ("Character evidence and evidence of other crimes") or KRE 609 ("Impeachment by evidence of conviction of crime") we conclude that the former allegation of error is preserved while the latter two are not. This Court will accordingly review the trial court's ruling on the alleged lack of KRE 404(c) notice for abuse of discretion and will review the assertion that the prior home invasion evidence was improper under KRE 404(b) and that the Commonwealth's questioning constituted improper impeachment under KRE 609 for palpable error.[23]

### 1. *KRE 404(c) Notice*

Manning first alleges that the Commonwealth failed to provide adequate notice pursuant to KRE 404(c) of its intent to introduce evidence of a prior bad act. As noted, we review this issue for abuse of discretion and will accordingly affirm the trial court's ruling that proper notice was provided unless that ruling "was arbitrary, unreasonable, unfair, or unsupported by sound legal

---

[23] Manning argues that her counsel's objection to the prior bad act evidence on KRE 404(c) grounds was sufficient to preserve the argument that the evidence was improperly admitted under KRE 404(b); an argument we reject. *Cf. Mayo v. Commonwealth*, 322 S.W.3d 41, 51 (Ky. 2010) (demonstrating that a challenge based on a lack of notice under KRE 404(c), and a challenge based on the admissibility of evidence under KRE 404(b) are treated as distinct issues for the purposes of determining preservation). In the alternative, Manning requested review for palpable error pursuant to RCr 10.26.

principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).  As we have also noted, the Commonwealth eFiled its notice of intent to introduce prior bad acts evidence.  During defense counsel's first appearance before the trial court on Manning's behalf the court informed him that all documents were to be eFiled, and defense counsel eFiled at least three documents[24]  before the Commonwealth eFiled the KRE 404(c) notice at issue herein. The Commonwealth's KRE 404(c) notice is included in the record before this Court, which we presume is the same record in which the trial court found the notice during the bench conference following defense counsel's objection.  All documents that are eFiled in the Commonwealth contain a "stamp line," for lack of a better term, indicating the case number, the date the document was filed, the name of the circuit court clerk, and the county the circuit clerk serves.  In this case, the notice filed by the Commonwealth contains such a stamp line which provides, in relevant part, that the notice was filed on November 29, 2021.

In criminal cases, KRE 404(c) mandates that the Commonwealth "shall give reasonable pretrial notice to the defendant of its intention to offer [prior bad acts] evidence."  The purpose of this evidentiary rule is "to provide the accused with an opportunity to challenge the admissibility of [prior bad act] evidence through a motion *in limine* and to deal with reliability and prejudice

---

[24] Those documents included defense counsel's entry of appearance as well as the motion for speedy trial and motion to dismiss the indictment for prosecutorial vindictiveness discussed in Section II(A) of this opinion.

problems at trial." *See, e.g.*, *Walker v. Commonwealth*, 52 S.W.3d 533, 538 (Ky. 2001) (quoting *Tamme v. Commonwealth*, 973 S.W.2d 13, 31 (Ky. 1998)). "Whether reasonable pre-trial notice has been given is decided on a case-by-case basis." *Walker*, 52 S.W.3d at 538.

Ordinarily, the filing of a notice such as the one filed by the Commonwealth in this case would be deemed sufficient KRE 404(c) notice. However, the wrinkle in this case that warrants closer inspection is that, despite the fact that the notice was undisputedly e-filed into the record, Manning asserts that there is no indication that her counsel received that notice. Specifically, she asserts that because the certificate of service on the notice does not indicate it was served on her attorney, because the notice was never mentioned by the trial court or the Commonwealth in any of numerous pretrial hearings in this case, and because of defense counsel's "obvious surprise" during opening statement, this Court should deem the Commonwealth's notice insufficient. We disagree.

The rules that govern eFiling are now known as "Administrative Rules of Practice and Procedure for the Kentucky Court of Justice Electronic Filing" or the "eFiling rules" for short. KY ST ADMIN E-FILING AP E-Filing, Sec. 1. In November 2021 when the notice at issue in this case was filed, the eFiling rules were still in their "pilot project" phase. The eFiling rules have gone through several iterations following their fledgling state, with the latest of these changes going into effect in June of this year. As there is no indication that any changes were to have a retroactive effect, we will reference and apply the

31

versions of the eFiling rules that were in effect as of November 2021 when the Commonwealth's notice was filed.  *See* KRS 446.080 ("No statute shall be construed to be retroactive, unless expressly so declared.").[25]  At that time, Section 12 of the eFiling rules[26] stated:

> **(1) Notice of Electronic Filing.**  Upon the electronic filing of a document, the court's eFiling system will automatically generate and send a Notice of Electronic Filing (NEF) to all eFilers associated with that case, along with a hyperlink to the electronic document. Transmission of the NEF with a hyperlink to the electronic document constitutes service of the filed document under CR 5. No other service on those parties is required.

*see also* KY ST ADMIN E-FILING AP E-Filing, Sec. 2(10) (amended 2022, 2024) (defining "electronic service" as "the electronic transmission of documents to a party via the court's eFiling system. . . Electronic service of documents is sufficient to provide service in accordance with the Kentucky Rules of Procedure; no other service is required.").

Accordingly, when the Commonwealth eFiled its KRE 404(c) notice in this case, an NEF and a hyperlink to the notice would have been sent to all "eFilers" associated with the case, and the Commonwealth was not required to provide further service.  The question, then, is whether Manning's counsel was an "eFiler" associated with the case when the Commonwealth filed the notice.  In 2021, Section 8 of the eFiling rules provided in relevant part that "[i]n order to

---

[25] We acknowledge that the eFiling rules are just that, rules, and are not "statutes" as such.  However, the rules are housed within the Kentucky Revised Statutes along with KRS 446.080.  We therefore conclude it is appropriate to apply the "retroactivity rule" to the eFiling rules.

[26] Currently codified as Section 13.

become an eFiler in a supported action, the eFiler must electronically file an Entry of Appearance or any other supported document in that case, or the eFiler may use a supported feature for the purpose of opting into cases." KY ST ADMIN E-FILING AP E-Filing, Sec. 8(1) (amended 2022, 2023, 2024). On February 3, 2021, nine months before the Commonwealth filed its KRE 404(c) notice, Manning's counsel eFiled his entry of appearance. We therefore conclude that Manning's counsel was an eFiler in the case at the time the Commonwealth's prior bad act notice was filed and highlight that she has not argued otherwise on appeal. Because of this, the KRE 404(c) notice was available for defense counsel's review, and his failure to do so cannot be held against the Commonwealth. This Court further recognizes that Manning has never disputed that the document was available within the eFiling record.

We agree with Manning that the certificate of service on the Commonwealth's KRE 404(c) notice was insufficient under the eFiling rules in that it did not "show parties who received conventional service and parties who received electronic service." KY ST ADMIN E-FILING AP E-Filing, Sec. 12(5) (currently codified as Sec. 13(6)). Nevertheless, the purpose behind KRE 404(c) is to give defense counsel the ability to challenge any KRE 404(b) evidence that the Commonwealth seeks to introduce. With that purpose in mind, the Commonwealth's notice, deficient certificate of service or no, was available in the record for the defense to review and challenge for over a year before trial commenced in this case. Moreover, nothing in the certificate of service rule states that a failure to adhere to it will render service on the associated eFilers

33

in the case void.  We therefore cannot hold that the deficient certificate of service should serve to invalidate the Commonwealth's notice in toto and hold that the trial court did not abuse its discretion in finding that the Commonwealth provided reasonable KRE 404(c) notice.

## 2. *Admissibility of KRE 404(b) Evidence*

As previously discussed, Manning's argument that evidence of the Trigg County home invasion and robbery was improperly admitted under KRE 404(b) is unpreserved.  We will accordingly review for palpable error under RCr 10.26.  "Under this rule, an error is reversible only if a manifest injustice has resulted from the error.  That means that if, upon consideration of the whole case, a substantial possibility does not exist that the result would have been different, the error will be deemed nonprejudicial." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006).

The evidence rule at issue, KRE 404(b), directs that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  However, such evidence may be admissible "if offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]"[27]  KRE 404(b)(1).  Due to the inherent prejudicial nature of this kind of evidence, KRE 404(b) has always been interpreted as being

---

[27] KRE 404(b)(2) provides another exception to the general exclusionary rule if the prior bad act evidence offered is "inextricably intertwined" with the Commonwealth's evidence.  That exception has no application here.

exclusionary in nature, and trial courts are expected to "apply the rule cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime." *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994). To aid in this often difficult task, this Court established the routinely applied *Bell* test, which addresses three separate inquiries into the proffered evidence: its relevance, its probativeness, and its prejudice to the defendant compared to its probative value. *Bell*, 875 S.W.2d at 889-90.

In this case, the Commonwealth's KRE 404(c) notice argued that the evidence of the prior home invasion was admissible to show Manning's "preparation, plan, knowledge, and the absence of mistake or absence." But, because there was no challenge to this proffered evidence by the defense, it is difficult to discern precisely which of those exceptions the Commonwealth would have argued under in support of the evidence's admission and, likewise, whether the trial court would have ruled that the evidence was admissible and on what grounds. Before this Court, the Commonwealth asserts that the evidence was admissible to prove Manning's intent to commit the crimes alleged in this case. Rather than engaging in an analysis of this evidence's admissibility under the *Bell* test, we hold that even assuming the evidence's admission was improper under KRE 404(b), the error was not palpable.

It was undisputed that Manning was present in Taylor's home at the time of his murder, and although Anthony's trial testimony differed from his original statements to police and the statement provided in his *Alford* plea as discussed

35

below, evidence was presented that Anthony originally told police that Manning spoke to the unknown occupants of the Saturn twice before leaving the apartment complex. Two city cams then captured the Saturn following Manning and Anthony from the Cooperfield Apartment Complex to Taylor's home immediately preceding his death. And, on the morning of Taylor's murder, a large amount of crack cocaine was found in the minivan in which Manning and Anthony left Taylor's home following the shooting. Manning was known to frequently purchase crack cocaine from Taylor, and Anthony stated that he was sure that crack cocaine came from Taylor's house and that Manning would have been unable to purchase an amount that large. Perhaps most damning, Manning's DNA was found on a piece of duct tape recovered from Taylor's arm, a piece of duct tape recovered from the bathroom doorframe in Taylor's home, and on the inner ring of the empty roll of duct tape found in Taylor's home. This body of evidence demonstrated that Manning was not simply in the wrong place at the wrong time, but that she "solicited, counseled, commanded, or engaged in a conspiracy"[28] with the unknown men to effect Taylor's murder and robbery.

Based on the foregoing, we hold that there is not a substantial possibility that the outcome of Manning's trial would have been different absent the admission of the prior bad act evidence.

---

[28] This was the language used in the jury instructions for the counts of complicity to first degree murder and complicity to first degree robbery in this case. This language tracks the definition of complicity under KRS 502.020(1)(a) and (b).

### 3. *Impeachment Pursuant to KRE 609*

Manning next asserts an argument unrelated to the application of either KRE 404(c) or (b): that the Commonwealth's examination of Anthony concerning the Trigg County home invasion and robbery constituted improper impeachment under KRE 609. As previously discussed, because this error was unpreserved, we review for palpable error. KRE 609 provides in relevant part:

> For the purpose of reflecting upon the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record if denied by the witness, but only if the crime was punishable by death or imprisonment for one (1) year or more under the law under which the witness was convicted. The identity of the crime upon which conviction was based may not be disclosed upon cross-examination unless the witness has denied the existence of the conviction.

KRE 609(a). By its express terms, KRE 609 "limits the use for impeachment purposes of a prior felony conviction to the fact of the conviction and expressly disallows disclosure 'of the crime upon which the conviction was based. . .unless the witness has denied the existence of the conviction.'" *McPherson v. Commonwealth*, 360 S.W.3d 207, 212-23 (Ky. 2012). Accordingly, to the extent the Commonwealth pursued the line of questioning at issue for impeachment purposes, it should have first asked Anthony if he had ever been convicted of a felony. If Anthony responded "yes," the Commonwealth had to cease its questioning. The only eventuality that would have given the Commonwealth the ability to question Anthony about the specifics of the conviction, i.e., that it was for a home invasion and robbery, was if Anthony denied the conviction. Instead, the Commonwealth began discussing the crimes upon which the

conviction was based before it clarified to Anthony that it was referencing his Trigg County convictions. We therefore hold that the Commonwealth's questioning was improper under KRE 609(a). Nevertheless, for the same reasons we outlined in Section II(B)(2) of this opinion, we hold that there is not a substantial possibility that the outcome of Manning's trial would have been different absent the Commonwealth's improper impeachment of Anthony.

## C. Evidence of Anthony's *Alford* Plea

For her third assertion of error, Manning argues that the Commonwealth impermissibly used evidence of Anthony's *Alford* plea as substantive evidence of her guilt. The Commonwealth argues in response that it properly used Anthony's *Alford* plea to impeach his prior inconsistent statements. Manning acknowledges that this issue is unpreserved but requests review for palpable error pursuant to RCr 10.26. We reiterate that under this standard we must affirm unless upon consideration of the whole case a substantial probability exists that the outcome would have been different absent the admission of the challenged evidence. *Martin*, 207 S.W.3d at 3. Upon review, we conclude that the Commonwealth's initial introduction of the narrative statement in Anthony's plea was properly admitted to impeach his prior inconsistent statement, but further hold that the Commonwealth then improperly used Anthony's plea as substantive evidence of Manning's guilt. However, at bottom, we hold that the Commonwealth's improper use of Anthony's plea was not palpable error.

38

In the seminal case of *Parido v. Commonwealth* this Court, then recently formed, reenforced the rule established by its predecessor that it is usually "improper to show that a co-indictee has already been convicted under the indictment." 547 S.W.2d 125, 127 (Ky. 1977) (quoting *Martin v. Commonwealth*, 477 S.W.2d 506 (1972)). And, if such evidence is introduced for a permissible purpose, "the court should tell the jury that it is only to be considered by them on the credibility of the witness." *Parido*, 547 S.W.2d at 127 (quoting *Webster v. Commonwealth*, 3 S.W.2d 754 (Ky. 1928)). *Parido* further held that when the Commonwealth uses a co-defendant's guilty plea as substantive evidence of the defendant's guilt it is "highly prejudicial to [the defendant's] substantial rights" and can necessitate reversal. *Parido*, 547 S.W.2d at 126; *see also Tipton v. Commonwealth*, 640 S.W.2d 818, 820 (Ky. 1982) (holding "[t]o make such a reference and to blatantly use the conviction as substantive evidence of the guilt of the indictee now on trial is improper[.]").

In the intervening years, this Court recognized that there are certain circumstances in which the introduction of evidence concerning a co-defendant's guilty plea is permissible. For example, the Court in *Gaines v. Commonwealth* held that the Commonwealth is permitted to cross-examine a co-defendant concerning his or her guilty plea if the defendant "opens the door" to that evidence. 13 S.W.3d 923, 924-25 (Ky. 2000); *see also Mayse v. Commonwealth*, 422 S.W.3d 223, 227 (Ky. 2013). This Court has also held that if a defendant does not object to the introduction of evidence concerning a co-defendant's guilty plea and it is apparent from the record that the

39

defendant's failure to do so was part of his or her trial strategy, no error occurs. *King v. Commonwealth*, 276 S.W.3d 270, 277 (Ky. 2009); *St. Clair v. Commonwealth*, 140 S.W.3d 510, 544 (Ky. 2004); *Tamme*, 973 S.W.2d at 32-33. Finally, in *Porter v. Commonwealth*, this Court, citing *Tipton*, held that "[a] guilty plea is admissible pursuant to KRE 613, which permits impeachment of a witness by his prior inconsistent statements provided those statements are inconsistent with testimony given by the pleader at an earlier proceeding." 892 S.W.2d 594, 597 (Ky. 1995) (evidence introduced was the entire video record of witness' guilty plea proceedings).

In this case, the Commonwealth first mentioned Anthony's *Alford* plea during opening statements. It said:

> I anticipate Anthony is going to come in here to testify and try and flip the script, try and save his momma. But, when he entered his guilty plea to facilitation, that is driving her there, his guilty plea said, under oath, the following facts. He signed it, he entered it as part of his guilty plea. When he testifies, you'll see that document most likely.

Clearly, the Commonwealth made this statement in anticipation that Anthony's trial testimony would differ from the facts he swore to when he entered his *Alford* plea. But, although "opening and closing arguments are not evidence and prosecutors are given considerable leeway during both[,]" *Mayse*, 422 S.W.3d at 227, we must stress that it would have been better practice for the Commonwealth to refrain from mentioning Anthony's plea until circumstances allowing its discussion—his inconsistent trial testimony—presented itself.

Moreover, although opening statements are not evidence, the

Commonwealth's statement that "[Anthony] entered his guilty plea to facilitation, that is driving [Manning] there" was clearly an attempt by the Commonwealth to use Anthony's plea to support its contention that Manning was guilty and was therefore improper. *Cf. Mayse*, 422 S.W.3d at 227-28 (noting that the Commonwealth's closing argument "[was] not a blatant use of a co-indictee's conviction as substantive evidence of [the defendant's] guilt[,]" and that its holding "[was] not an invitation for prosecutions to liberally discuss a co-indictee's conviction for any purpose other than credibility. . . of that witness.").

Later, the Commonwealth called Anthony as a witness. During his direct examination, he provided testimony that did in fact deviate in several material ways from his original statements to police, which had been memorialized in the narrative section of his *Alford* plea. Specifically, Anthony testified that after he and Manning walked out of Robinson's apartment and into the parking lot of the Cooperfield Apartment Complex, he went straight to the minivan while Manning "veered off" somewhere else. He claimed he did not see where she went and did not see her speaking to the occupants of the Saturn. He further testified that once she got in the minivan she did not get out and speak to the occupants of the Saturn for a second time. Anthony maintained that when he and Manning got to Taylor's house, she entered first, and the two occupants of the Saturn entered the home after Manning was already inside. Finally, he asserted that when he went into Taylor's home to find Manning after the two unidentified men had fled, he found her in the bathroom, but the bathroom

41

door was shut rather than open. After Anthony provided this testimony, the following exchange occurred:

**CW:** Now, you entered a guilty plea, correct?

**AM:** No sir.

**CW:** Huh?

**AM:** No sir.

**CW:** Okay, let me show you this. [CW shows him his plea document]. Is that a document you signed and entered?

**AM:** Yes sir.

**CW:** And it says what?

**AM:** Guilty plea pursuant to *North Carolina v. Alford,* it's an *Alford* plea.

**CW:** Which is a guilty plea, okay? Right where it says, read number five.

**AM:** "The defendant hereby states under oath at the time of the guilty plea that he drove Manning to the residence of Calvin Taylor and picked her up and took her to an apartment complex, where she later met two unknown individuals. Defendant drove Manning to Calvin Taylor's residence where he waited outside [in] the van. Two unknown individuals followed the defendant to Calvin Taylor's residence. The defendant observed Manning knock on Taylor's door and when opened two unknown individuals entered Taylor's residence along with Manning. While these three subjects were in Taylor's residence the defendant heard multiple gunshots. He witnessed the two unknown individuals exit Calvin Taylor's residence carrying a Crown Royal bag that came from inside the residence. The defendant then entered Taylor's residence to get Manning since she did not come out. He saw Calvin Taylor lying in the kitchen floor with duct tape on his hands and his mouth, deceased from having been shot. The defendant located Manning sitting in the bathroom between the living room and the kitchen with the bathroom door wide open. He then got Manning and left Calvin Taylor's residence and went to their home on Country Club Lane, all at the direction of Manning."

42

**CW:** You swore that under oath at the time you entered your guilty plea, correct?

**AM:** Yes, sir.

We hold that no error occurred during the foregoing exchange. Anthony's trial testimony differed from the narrative statement provided in his plea. In accordance with *Porter,* the Commonwealth was permitted to introduce the sworn statements he made in his plea to impeach his prior inconsistent statement.

After the Commonwealth completed its direct examination, Manning's counsel began its cross-examination by eliciting from Anthony that he did not write out the narrative portion of his plea and did not know who did. Anthony then testified again to several facts that conflicted with the narrative portion of his plea, specifically: that he never saw Manning talking to anyone in the Saturn before they left the apartment complex, that he did not notice that the Saturn followed them from the apartment complex until they got to Taylor's house, and that Manning and the two unidentified men entered Taylor's home at different times. During the Commonwealth's subsequent re-direct examination, it attempted to attack the defense's implication that Anthony did not know what was in his plea agreement when he signed it:

**CW:** Now, when you did your plea, you sat down with me and we did an interview with you and your attorney, right?

**AM:** Correct.

**CW:** We went through all the details, correct?

**AM:** Correct.

**CW:** And that's where all that language came from that you signed because you read it and signed under oath that it was the truth when you signed it, correct?

**AM:** Correct.

**CW:** And that said your mom had met two guys, two people, right?

**AM:** That's what the paper states, yes sir.

**CW:** And that's what you testified was the truth, correct?

**AM:** Yes sir.

**CW:** But now you've met with [defense counsel] multiple times and now you testify to these people here that your mom never met anybody, your mom never went to a car, your mom never talked to anybody. True?

**AM:** True.

When defense counsel conducted re-cross examination shortly thereafter, he had Anthony clarify that he had never told Anthony what to say during his trial testimony other than to tell the truth, and that what he had testified to that day was the truth. During its subsequent re-direct examination, the Commonwealth asked Anthony if he perjured himself by swearing to statements of fact in his plea that were not true. Anthony responded he did not. After discussing other unrelated issues, the Commonwealth resumed questioning about his guilty plea:

**CW:** Yet your guilty plea, again, what's that charge right there?

**AM:** Facilitation.

**CW:** To what?

**AM:** Complicity to first degree murder.

**CW:** Facilitation to complicity to murder. What's the next one?

44

**AM**:  Facilitation to first degree robbery.

**CW**: *You entered guilty pleas to facilitating the complicity to robbery and murder.  And the only person that you hauled around in your [minivan] was right there, your mom.*  Correct?

**AM**: Yes sir.

(Emphasis added).  This exchange was improper and constitutes a textbook example of what the Commonwealth is not permitted to do pursuant to *Parido* and *Tipton*.  By highlighting that Anthony pled guilty to facilitation, and that the only person he facilitated was Manning, the Commonwealth was blatantly attempting to use evidence of Anthony's guilt as substantive evidence of Manning's guilt.  We hold that this was error.  This error was further compounded during closing argument when the Commonwealth again asserted that Anthony's plea was proof of Manning's guilt; it argued:

> I told you during opening statements, I anticipated Anthony coming in here and trying to protect his mom.  I knew that was going to happen, I see it all the time, it happens all the time.  But, what you have to look at is what did Anthony tell law enforcement.  What did he, when he entered his guilty plea under oath, what did he sign and what did he tell the judge was the truth.  Now, one thing that is interesting is that Anthony pled guilty to facilitation to complicity to murder and facilitation to complicity to robbery.  The only thing Anthony did was drove (sic) his mom.  That's it.  He didn't drive anyone else, he only drove his mom.  So the only person he facilitated was his mom.  And he pled guilty to that knowing he's going to prison.  And yet she's not willing to accept her responsibility in this case, that's why we're here.  He ponied up and said yeah, I facilitated, I drove her.  She's complicit, I drove her, that's facilitation.
>
> . . .
>
> [Anthony] got up here and he would not say that his mom met with the two people, never would say mom went to the car.  "I don't know, I went to the van and I got in the van."  But he told law

45

enforcement that. He told the judge right here that. When he entered his guilty plea he said it. I've never met a defendant yet that wrote their plea agreement out. I've never, never seen that. So when [defense counsel] said "well you didn't write this," I've never seen a guilty plea that any defendant has wrote (sic). It doesn't happen. That's why we interview them, then we write the narrative, they read it, they agree to it, they say under oath yes that it true and correct, sign their name and enter a guilty plea in front of the judge again saying this is the truth, I swear, I enter my plea. Again, Anthony entered a guilty plea to facilitation to complicity. And the only person he dealt with was his mom. Only person.

Again, notwithstanding that closing arguments are not evidence, this was clear error in that the Commonwealth was blatantly attempting to use Anthony's plea as substantive evidence of Manning's guilt. We also note that the jury was never given an admonition to only consider evidence of Anthony's guilty plea as affecting his credibility and not to consider it as evidence of Manning's guilt.

Nevertheless, we must review this issue for palpable error. And, as previously discussed, given the strength of the evidence against Manning, we cannot conclude that there is a substantial possibility the outcome of her trial would have been different if the Commonwealth's improper use of Anthony's *Alford* plea was omitted from the evidence.

### D. Alleged Comments on Right to Remain Silent

Manning's final claim of error is that the Commonwealth improperly elicited evidence regarding Manning's invocation of her right to remain silent. During Det. Luckingham's direct examination, the Commonwealth asked him to discuss his preliminary investigation in the case. During that line of questioning, the Commonwealth asked him if a search warrant was ever obtained to search Manning's house. In response, Det. Luckingham began

explaining the timeline of when the search warrant was obtained for the first search of her home:

> So after Manning and Anthony come back to HPD,[29] Anthony is interviewed for a long time. It was a lengthy interview. *We tried to talk to Manning again, she didn't really want to talk at that time so we attempted a second interview and really got nowhere with it* but after talking to Anthony and getting a lot of the details of his testimony, his statement of what happened, we came to learn that he was the one driving the van to and from the crime scene with Manning in the van and at that time we obtained the search warrant for the house Manning was living in.

(Emphasis added). Defense counsel did not object to the detective's response.

After Det. Luckingham testified, the Commonwealth called four other witnesses, which took nearly two hours. It then recalled Det. Luckingham. In relevant part, the Commonwealth questioned him about his first interview with Manning which occurred on the same morning as the murder. The Commonwealth asked if during that interview Manning gave a statement about the last time she spoke to Taylor. The detective said that Manning claimed the last time she saw Taylor was around midnight on the night of the shooting, and that she acknowledged that she purchased and smoked crack cocaine at Taylor's home during that visit. Then, without any prompting from the Commonwealth Det. Luckingham said, "So, I mean there was another attempt to talk to Manning, but she didn't want to talk at that time." Defense counsel did not object to this testimony.

---

[29] Hopkinsville Police Department.

During defense counsel's cross-examination of Det. Luckingham during recall, the defense highlighted the fact that Det. Luckingham had interviewed Manning three times, but he did not interview any of the other persons of interest three times. In response to this, the Commonwealth pursued the following line of questioning on re-direct:

> **CW:** When you interviewed [Manning] did you, in each of your interviews, did you get to ask all the questions you wanted to ask?
>
> **DL:**[30] No.
>
> **CW:** And how come?
>
> **DL:** Basically because, well, the first one Manning just ended very abruptly—

At that point, defense counsel objected on the grounds that the questioning was encroaching on Manning's right to remain silent. The Commonwealth asserted that defense counsel had opened the door to the questioning by criticizing the detective for questioning Manning three times, but no one else. The Commonwealth asserted that the detective should be allowed to explain why he had to interview her three times. The trial court sustained defense counsel's objection and ruled that the detective could provide some explanation as to why there were three interviews, but that he needed to avoid discussing her refusal to answer questions. Defense counsel did not request an admonition. The Commonwealth's questioning resumed as follows:

> **CW:** So when you interviewed [Manning], she abruptly just was done with the interview.

---

[30] Det. Luckingham.

**DL:** Correct.

**CW:** And that happened on multiple occasions? As far as her just ending the interview?

**DL:** Yes.

**CW:** Okay, thus, multiple interviews, correct?

**DL:** Yes.[31]

Before reaching the merits, we must address the parties' dispute concerning preservation. As discussed above, there are three pieces of Det. Luckingham's testimony that Manning challenges as an improper comment on her right to remain silent. The first instance occurred during the first time Det. Luckingham was called by the Commonwealth to testify, and Manning did not object to it. The second and third instances occurred after Det. Luckingham was recalled by the Commonwealth; Manning did not object to the second instance, but she did object to the third. Manning concedes before that the first two instances were therefore not preserved for review and requests review of them for palpable error. However, because she objected to the third instance of Det. Luckingham's alleged comment on her right to remain silent, she contends that instance should be considered preserved. The Commonwealth responds that, because she did not object as soon as the basis for the objection

---

[31] To clarify, for this particular line of questioning—beginning with the detective's testimony that she abruptly ended the interview and ending with the Commonwealth clarifying why the detective conducted three interviews with Manning—Manning only challenges the detective's statement that she abruptly ended the interview. She has not alleged error in relation to the Commonwealth's clarification as to why the detective conducted three interviews with her. Thus, there are three alleged instances of commenting on her right to remain silent rather than four.

became apparent, i.e., the first time Det. Luckingham arguably commented on her right to remain silent, her arguments concerning all three instances should be considered unpreserved. We disagree with the Commonwealth. We consider the first two instances of Det. Luckingham's testimony unpreserved based on a lack of contemporaneous objection and will review those instances for palpable error. We consider the third instance of Det. Luckingham's testimony preserved for our review.

In general, "[t]he Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody." *Hunt v. Commonwealth*, 304 S.W.3d 15, 35 (Ky. 2009). This tenet was born out of the United States Supreme Court's holding in *Doyle v. Ohio* that, because *Miranda* warnings implicitly inform an individual that their silence will not be used against him or her, it would be fundamentally unfair to allow that individual's post-*Miranda* silence to be used against him or her at trial. 426 U.S. 610, 617-18 (1976).[32] However,

> *Doyle* and subsequent cases make it clear that not every isolated instance referring to post-arrest silence will be reversible error. It is only reversible error where post-arrest silence is deliberately used to impeach an explanation subsequently offered at trial or where there is a similar reason to believe the defendant has been prejudiced by reference to the exercise of his silence as a prosecutorial tool. The usual situation where reversal occurs is

---

[32] We note here that there was no indication from the testimony at trial that Manning was provided with her *Miranda* warnings prior to any of her interviews with Det. Luckingham. However, as neither party has asserted otherwise, we will assume that she was for the purposes of our analysis.

> where the prosecutor has repeated and emphasized post-arrest silence as a prosecutorial tool.

*Wallen v. Commonwealth*, 657 S.W.2d 232, 233 (Ky. 1983), *see also Hunt v. Commonwealth*, 304 S.W.3d 15, 36 (Ky. 2009).  Those circumstances do not exist in this case.

The first portion of Det. Luckingham's testimony that Manning asserts was an improper comment on her right to remain silent came in response to the Commonwealth asking him when a search warrant to search Manning's house was obtained.  As Det. Luckingham was providing a narrative of the timeline concerning when the warrant was obtained, he spontaneously said, "We tried to talk to Manning again, she didn't really want to talk at that time, so we attempted a second interview and really got nowhere with it[.]"  Similarly, the second instance of which Manning complains occurred while Det. Luckingham was discussing the information he received from her during her first interview.  And, without prompting from the Commonwealth, he said, "So, I mean there was another attempt to talk to Manning, but she didn't want to talk at that time."

Accordingly, both statements were made by the detective while providing the details of his investigation and neither were in response to a direct question by the Commonwealth.  Moreover, these were fleeting comments within a multiple day trial and the Commonwealth did not improperly draw attention to Manning's choice to remain silent.  *Cf. Vincent v. Commonwealth*, 281 S.W.3d 785, 789-90 (Ky. 2009); *Hunt v. Commonwealth*, 304 S.W.3d 15, 36-37 (Ky.

51

2009); *Wallen*, 657 S.W.2d at 233. We therefore conclude that no error, palpable or otherwise, occurred concerning these portions of the detective's testimony.

Similarly, in context, we cannot conclude that the third piece of Det. Luckingham's testimony was an improper comment on Manning's right to remain silent. During the defense's cross-examination of Det. Luckingham on recall, the defense highlighted the fact that Det. Luckingham interviewed Manning three times but did not interview any of the other persons of interest in the case that many times. This undoubtedly was meant to support the defense's theory of the case that law enforcement immediately focused their attention on Manning and failed to adequately pursue other potential suspects. In response to this criticism by the defense, the Commonwealth elicited from the detective that the reason he had to interview Manning three times was that she abruptly ended the interviews on multiple occasions. The Commonwealth's questioning was not an attempt to emphasize Manning's silence as a prosecutorial tool. Rather, it was meant to allow the detective to explain why numerous interviews occurred with Manning which in turn rebutted her primary defense. As the Commonwealth properly limited its questioning of the detective to explaining why multiple interviews with Manning occurred and did not repeat or emphasize her choice to end the interviews as evidence of her guilt, we hold that no improper comment on her right to remain silent occurred and that the trial court accordingly did not abuse its discretion in overruling her objection.

## III.   CONCLUSION

Based on the foregoing, we affirm.

All sitting.  Bisig, Keller, Nickell and Thompson, JJ.; concur. Conley, J., concurs in result only by separate opinion in which VanMeter, C.J., joins.

CONLEY, J., CONCURRING IN RESULT ONLY BY SEPARATE OPINION: I concur in result only because the conduct of the Commonwealth at trial does not warrant any greater imprimatur by this Court than already given. While I agree the several errors committed by the Commonwealth were either harmless or non-palpable, that is only in light of the totality of the physical evidence linking Manning to this murder, including DNA evidence, and the fact that her defense conceded her presence in the home with nothing better than a "wrong place, wrong time" theory—God and juries have little regard for coincidence. While the harmless error and palpable error rules exist for salutary reasons— namely, that a conviction ought not be overturned on technicalities if the result would have been the same but for the errors—there is a negative externality to the rule in that the Commonwealth goes unpunished for its errors. In brief, the lack of consequence can incentivize further breaches, and we have more and more encountered similar poor conduct in other cases.

The improper impeachment of Anthony pursuant to KRE 609 regarding his prior conviction in Trigg County is something to be expected of a novice but not an experienced lawyer in the Commonwealth's Attorney's office. Anthony's credibility, or lack thereof, did not need further demonstration by

53

the Commonwealth. For whatever reason though, the Commonwealth was intent on portraying Anthony in as worse a light as possible and thus committed this error when it could have trusted the jury to see Anthony's lack of credibility on its own terms. History is permeated with examples that the overzealous pursuit of justice can itself lead one astray and the Commonwealth would have done better to remember that below. The Commonwealth's use of Anthony's *Alford* plea as evidence of Manning's guilt was a deliberate flouting of the rule of *Parido v. Commonwealth*, 547 S.W.2d 125, 126 (Ky. 1977); and did constitute a blatant use of Anthony's plea to implicate Manning. *Tipton v. Commonwealth*, 640 S.W.2d 818, 820 (Ky. 1982). While such an error could be forgiven if momentary and in the heat of cross examination, the fact that the Commonwealth cited the plea agreement in its closing statement demonstrates the error was deliberate.

It is my belief that the DNA evidence below is the only saving-grace that allows this Court to conclude these errors do not warrant reversal. But the presence of DNA evidence is not a license to play fast-and-loose with other rules. When it comes to Commonwealth's Attorneys' and their assistants, "[n]o one except for the judge himself is under a stricter obligation to see that every defendant receives a fair trial, a trial in accordance with the law, which means the law as laid down by the duly constituted authorities, and not as the prosecuting attorney may think it ought to be." *Niemeyer v. Commonwealth*, 533 S.W.2d 218, 222 (Ky. 1976), *overruled on other grounds by Blake v. Commonwealth*, 646 S.W.2d 718 (Ky. 1983). To paraphrase C.S. Lewis,

54

experience is a brutal teacher, but at least you learn. And the day may come where this Court has to reverse a conviction under a harmless or palpable error standard, even though supported by DNA evidence, to rein in inexcusable trial conduct.

VanMeter, C.J., joins.

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Christopher Henry
Assistant Attorney General